## MOURNING *v.* FAMILY PUBLICATIONS SERVICE, INC.

No. 71–829.  Argued November 9, 1972—Decided April 24, 1973

Burger, C. J., delivered the opinion of the Court, in which Brennan, White, Marshall, and Blackmun, JJ., joined. Douglas, J., filed an opinion dissenting in part, in which Stewart and Rehnquist, JJ., joined, *post*, p. 378. Powell, J., filed a dissenting opinion, *post*, p. 383.

*Eric Schnapper* argued the cause for petitioner. With him on the briefs were *Jack Greenberg, James M. Nabrit III, M. Donald Drescher,* and *Leonard Helfand.*

*Robert S. Rifkind* argued the cause for respondent. With him on the brief were *William S. Frates* and *Larry S. Stewart.*

*A. Raymond Randolph, Jr.,* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Wood, Alan S. Rosenthal,* and *Greer S. Goldman.**

---

**Edward Donald Foster, Richard A. Hesse,* and *Blair C. Shick* filed a brief for the National Consumer Law Center, Inc., as *amicus curiae* urging reversal.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted the writ of certiorari in this case to resolve whether the Federal Reserve Board exceeded its authority under § 105 of the Truth in Lending Act [1] in promulgating that portion of Regulation Z commonly referred to as the "Four Installment Rule." [2]

Respondent is a Delaware corporation which solicits subscriptions to several well-known periodicals. In 1969, one of respondent's door-to-door salesmen called on the petitioner, a 73-year-old widow residing in Florida, and sold her a five-year subscription to four magazines. Petitioner agreed to pay $3.95 immediately and to remit a similar amount monthly for 30 months. The contract form she signed contained a clause stating that the subscriptions could not be canceled and an acceleration provision similar to that found in many installment undertakings, providing that any default in installment payments would render the entire balance due. The contract did not recite the total purchase price of the subscriptions or the amount which remained unpaid after the initial remittance, and made no reference to service or finance charges. The total debt assumed by the petitioner was $122.45; the balance due after the initial payment was $118.50.

Petitioner made the initial payment, began to receive the magazines for which she had contracted, and then defaulted. Respondent declared the entire balance of $118.50 due and threatened legal action. Petitioner brought this suit in United States District Court, alleging that respondent had failed to comply with the disclosure provisions of the Truth in Lending Act. She sought re-

---

[1] 82 Stat. 148, 15 U. S. C. § 1604.
[2] 12 CFR § 226.2 (k) (1972 rev.).

covery of the statutory penalty and reimbursement for the costs of the litigation, including reasonable attorney's fees.

In support of her claim, petitioner submitted to the District Court a series of "dunning" letters which she had received from respondent. One letter, dated December 16, 1969, stated:

> "After making the terms of our contract clear to you, we went ahead in good faith and had your subscriptions entered for the entire periods you had agreed to take. The contract you signed is: Not subject to cancellation after acceptance or verification.
>
> "Knowing, therefore, the obligations we have incurred in your name, we feel confident that you will continue your magazine subscriptions and make the convenient monthly payments regularly and promptly." [3]

A second letter, received a week later from respondent's agent, declared:

> "After an account is three months delinquent it is brought to my attention. I feel that you should realize that you are receiving our merchandise which we have paid for. *Had you dealt directly with the publishers yourself, you would have had to pay them in advance for the magazines.*
>
> "Again, let me remind you that we have ordered these magazines in advance and that you have incurred an obligation to repay us. *This is a credit account, and as such must be repaid by you on a monthly basis,* much the same as if you had purchased any other type of merchandise on a monthly

---

[3] App. 21.

budget plan.  [Emphasis supplied; underlined words are emphasized in the original letter]." [4]

Respondent admitted sending each of the above letters to petitioner.[5]  In addition, respondent submitted one affidavit to the District Court, describing the nature of the contracts which it offered to its clients.  The affidavit stated that a customer who ordered magazine subscriptions from respondent was required to pay for all magazines during the first half of the contract term.[6]  Thus, according to the affidavit, at all times during the course of a contract, a purchaser who has complied with the

---

[4] App. 20.

[5] Petitioner also submitted to the court a letter sent to her legal counsel by respondent's office manager.  The letter stated:

"Whereas, FPS, acts initialy [sic] as agent for the various publishers; upon acceptance of her contract, FPS thereafter acts solely as financier, and co-guaranter [sic] of service with the various publishers; whereas, FPS, has fully invested in Mrs. Mourning's contract and does not receive refund in part or full from any, or, all publishers; for said FPS, investment, we therefore, must insist on compliance of your client to the terms of said contract until fullfilment [sic] of said terms in the aforementioned contract result [sic] in mutual resolve [sic] of liability."  App. 14.

Respondent admitted that this letter had been written on its stationery by its employee, but denied that the employee was authorized to send it.  Consequently, we do not consider the facts stated in the letter to have been admitted by respondent.

[6] Affidavit of Stanley R. Swanson, Vice President of Family Publications Service, Inc., Aug. 26, 1970, p. 2 (District Court Record 198, 199).  The affidavit also stated that, while customers of respondent were free to pay the entire price of their magazine subscriptions when their contract with respondent was signed, the price charged would be equal to the aggregate of the payments that would have been made had the customer elected to pay in installments.  Respondent now admits that this statement was not true.  In some cases, customers who agreed to pay the entire contract price immediately were charged less than the aggregate amount of the installment payments.

terms of the contract has paid for more magazines than he has received. Respondent did not, however, submit any affidavit to the court contesting any of the facts stated in its "dunning" letters. On this record, both parties moved for summary judgment, declaring explicitly that no factual question remained undecided.

Section 121 of the Truth in Lending Act requires merchants who regularly extend credit, with attendant finance charges,[7] to disclose certain contract information "to each person to whom consumer credit is extended and upon whom a finance charge is or may be imposed . . . ."[8] Among other relevant facts, the merchant must, where applicable, list the cash price of the merchandise or service sold, the amount of finance and other charges, and the rate of the charges.[9] Failure to disclose renders the seller liable to the consumer for a penalty of twice the amount of the finance charge, but in no event less than $100 or more than $1,000.[10] The creditor may also be assessed for the costs of the litigation, including reasonable attorney's fees[11] and, in certain circumstances not relevant here, may be the subject of criminal charges.[12]

Section 105 of the Act[13] provides:

> "The [Federal Reserve] Board shall prescribe regulations to carry out the purposes of [the Act]. These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board

---

[7] § 103 (f), 15 U. S. C. § 1602 (f). Certain transactions, not here relevant, are exempt under § 104, 15 U. S. C. § 1603.

[8] 15 U. S. C. § 1631.

[9] § 128, 15 U. S. C. § 1638.

[10] § 130, 15 U. S. C. § 1640.

[11] Ibid.

[12] § 112, 15 U. S. C. § 1611.

[13] 15 U. S. C. § 1604.

are necessary or proper to effectuate the purposes of [the Act], to prevent circumvention or evasion thereof, or to facilitate compliance therewith."

Accordingly, the Board has promulgated Regulation Z, which defines the circumstances in which a seller who regularly extends credit must make the disclosures outlined in § 128.[14]   The regulation provides that disclosure is necessary whenever credit is offered to a consumer "for which either a finance charge is or may be imposed or which pursuant to an agreement, is or may be payable in more than four installments." [15]

Relying on the rule governing credit transactions of more than four installments, the District Court granted summary judgment for petitioner.  The court found that respondent had extended credit to petitioner,[16] which by agreement was payable in more than four installments, but had failed to comply with the disclosure provisions of the Act.

The Court of Appeals reversed, holding that the Board had exceeded its statutory authority in promulgating the regulation upon which the District Court relied.  The regulation was found to conflict with § 121 of the Act [17] since it required that disclosure be made in regard to some credit transactions in which a finance charge had

---

[14] 15 U. S. C. § 1638.

[15] 12 CFR § 226.2 (k) (1972 rev.).

[16] Respondent challenges the finding of the District Court that credit was extended to petitioner.  In some cases in which a consumer pays in installments for a magazine subscription, credit may not have been extended to the consumer.  However, in view of the admissions by respondent which were before the District Court, respondent's failure to controvert those admissions by affidavit, and the litigation posture which respondent has consistently maintained beginning in the District Court, i. e., that no factual matters remained unresolved, we conclude that summary judgment on this issue was properly granted.  Fed. Rule Civ. Proc. 56 (e).

[17] 15 U. S. C. § 1631.

not been imposed. As an alternative ground for its decision, the Court of Appeals held that the regulation created a conclusive presumption that credit payments made in more than four installments included a finance charge. Relying on *Schlesinger* v. *Wisconsin,* 270 U. S. 230 (1926), and *Heiner* v. *Donnan,* 285 U. S. 312 (1932), the court concluded that such an irrebuttable presumption of fact violated the Due Process Clause of the Fifth Amendment.

I

Passage of the Truth in Lending Act in 1968 culminated several years of congressional study and debate as to the propriety and usefulness of imposing mandatory disclosure requirements on those who extend credit to consumers in the American market. By the time of passage, it had become abundantly clear that the use of consumer credit was expanding at an extremely rapid rate. From the end of World War II through 1967, the amount of such credit outstanding had increased from $5.6 billion to $95.9 billion, a rate of growth more than $4\frac{1}{2}$ times as great as that of the economy.[18] Yet, as the congressional hearings revealed, consumers remained remarkably ignorant of the nature of their credit obligations and of the costs of deferring payment.[19] Because of the divergent, and at times fraudulent, practices by which consumers were informed of the terms of the credit extended to them, many consumers were prevented from shopping for the best terms available and, at times, were prompted to assume liabilities they could not meet.[20] Joseph Barr, then Under Secretary of the Treasury, noted in testifying before a Senate sub-

---

[18] H. R. Rep. No. 1040, 90th Cong., 1st Sess., 10–11 (1967).

[19] *Id.,* at 13; S. Rep. No. 392, 90th Cong., 1st Sess., 2–3 (1967).

[20] H. R. Rep. No. 1040, *supra,* n. 18, at 13; S. Rep. No. 392, *supra,* n. 19, at 1–2.

committee that such blind economic activity is inconsistent with the efficient functioning of a free economic system such as ours, whose ability to provide desired material at the lowest cost is dependent on the asserted preferences and informed choices of consumers.[21]

The Truth in Lending Act was designed to remedy the problems which had developed. The House Committee on Banking and Currency reported, in regard to the then proposed legislation:

"[B]y requiring all creditors to disclose credit information in a uniform manner, and by requiring all additional mandatory charges imposed by the creditor as an incident to credit be included in the computation of the applicable percentage rate, the American consumer will be given the information he needs to compare the cost of credit and to make the best informed decision on the use of credit." [22]

This purpose was stated explicitly in § 102 of the legislation enacted:

"The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to

---

[21] Hearings on H. R. 11601 before the Subcommittee on Consumer Affairs of the House Committee on Banking and Currency, 90th Cong., 1st Sess., pt. 1, p. 76 (1967).

[22] H. R. Rep. No. 1040, *supra*, n. 18, at 13.

compare more readily the various credit terms available to him and avoid the uninformed use of credit." [23]

The hearings held by Congress reflect the difficulty of the task it sought to accomplish. Whatever legislation was passed had to deal not only with the myriad forms in which credit transactions then occurred, but also with those which would be devised in the future.[24] To accomplish its desired objective, Congress determined to lay the structure of the Act broadly and to entrust its construction to an agency with the necessary experience and resources to monitor its operation. Section 105 delegated to the Federal Reserve Board broad authority to promulgate regulations necessary to render the Act effective. The language employed evinces the awareness of Congress that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish. It indicates as well the clear desire of Congress to insure that the Board had adequate power to deal with such attempted evasion. In addition to granting to the Board the authority normally given to administrative agencies to promulgate regulations designed to "carry out the purposes" of the Act, Congress specifically provided, as noted earlier, that the regulations may define classifications and exceptions to insure compliance with the Act.[25]

---

[23] 15 U. S. C. § 1601.

[24] See letter from Paul R. Dixon, Chairman of the Federal Trade Commission, to Senator A. Willis Robertson, Chairman of the Senate Committee on Banking and Currency, Feb. 18, 1964, in Hearings on S. 750 before the Subcommittee on Production and Stabilization of the Senate Committee on Banking and Currency, 88th Cong., 1st and 2d Sess., pt. 2, p. 1303 (1963–1964).

[25] 15 U. S. C. § 1604.

See *supra*, at 361–362. The Board was thereby empowered to define such classifications as were reasonably necessary to insure that the objectives of the Act were fulfilled, no matter what adroit or unscrupulous practices were employed by those extending credit to consumers.

One means of circumventing the objectives of the Truth in Lending Act, as passed by Congress, was that of "burying" the cost of credit in the price of goods sold. Thus in many credit transactions in which creditors claimed that no finance charge had been imposed, the creditor merely assumed the cost of extending credit as an expense of doing business, to be recouped as part of the price charged in the transaction.[26] Congress was well aware, from its extensive studies, of the possibility that merchants could use such devices to evade the disclosure requirements of the Act. The Committee hearings are replete with suggestions that such manipulation

---

[26] For example, two merchants might buy watches at wholesale for $20 which normally sell at retail for $40. Both might sell immediately to a consumer who agreed to pay $1 per week for 52 weeks. In one case, the merchant might claim that the price of the watch was $40 and that the remaining $12 constituted a charge for extending credit to the consumer. From the consumer's point of view, the credit charge represents the cost which he must pay for the privilege of deferring payment of the debt he has incurred. From the creditor's point of view, much simplified, the charge may represent the return which he might have earned had he been able to invest the proceeds from the sale of the watch from the date of the sale until the date of payment. The second merchant might claim that the price of the watch was $52 and that credit was free. The second merchant, like the first, has forgone the profits which he might have achieved by investing the sale proceeds from the day of the sale on. The second merchant may be said to have "buried" this cost in the price of the item sold. By whatever name, the $12 differential between the total payments and the price at which the merchandise could have been acquired is the cost of deferring payment.

would render the Act a futile gesture in the case of goods normally sold by installment contract.[27] Opponents of the bill contended that the reporting provisions would actually encourage merchants who had formerly segregated their credit costs not to do so. They predicted that the effect of the Act would thus be to reduce the amount of information available to the consumer, a result directly contrary to that which was intended.[28] Proponents of the legislation claimed that the Act would enhance the consumer's ability to make an informed choice even if finance charges were hidden. In response to a claim that credit costs would be incorporated in the price of goods, Senator Douglas, who first proposed the Truth in Lending Act, stated:

> "I would like to call to your attention, Senator, for purposes of the record, that this bill does not provide for judgment solely on the basis of the . . . annual interest rate or the total finance charges. It also provides that there shall be a statement of the

---

[27] Hearings on S. 1740 before the Subcommittee on Production and Stabilization of the Senate Committee on Banking and Currency, 87th Cong., 1st Sess., 49, 56–57, 127, 389–390, 447–448, 563, 1155–1156 (1961); Hearings on S. 1740 before the Subcommittee on Production and Stabilization of the Senate Committee on Banking and Currency, 87th Cong., 2d Sess., 16, 45, 265, 267–268, 287, 341–342, 360–361, 365–367, 376, 407, 415 (1962); Senate Hearings on S. 750, 88th Cong., 1st and 2d Sess., *supra*, n. 24, pts. 1 and 2, pp. 13–14, 749, 1284–1285; Hearings on S. 5 before the Subcommittee on Financial Institutions of the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., 41–42, 123–134, 377–379, 513, 699 (1967); House Hearings on H. R. 11601, 90th Cong., 1st Sess., *supra*, n. 21, pts. 1 and 2, pp. 583, 590–591, 802, 825–826.

[28] Senate Hearings on S. 1740, 87th Cong., 2d Sess., *supra*, n. 27, at 287; Senate Hearings on S. 750, 88th Cong., 1st and 2d Sess., *supra*, n. 24, pt. 1, pp. 13–14; House Hearings on H. R. 11601, 90th Cong., 1st Sess., *supra*, n. 21, pt. 2, p. 596.

> cash price or delivery price of the property or service to be acquired. Both things are to be stated, price and finance charges, and the judgment of the consumer can be on the basis of both of these factors, not merely on one alone; and if a merchant tries to have a low finance charge and bury it in a high cash price or delivered price, then the purchaser can shop on price just as much as on the finance charges." [29]

It was against this legislative background that the Federal Reserve Board promulgated regulations governing enforcement of the Truth in Lending Act. In September 1968, with the aid of an advisory board composed of representatives of diverse retail, lending, and consumer groups, the Board compiled and released a draft of proposed regulations.[30] Comments and criticisms from interested parties were invited. After more than 1,800 responses were received and considered by the Board, the regulations were reviewed and published in the Federal Register.[31]

The Four Installment Rule was included in the original published draft of the regulations and was not amended prior to its final adoption.[32] The Board's objective in promulgating the rule was to prevent the Act from fulfilling the prophecy which its opponents had forecast. As J. L. Robertson, vice chairman of the Board of Governors, stated in an advisory letter issued a year later:

> "The Board felt that it was imperative to include transactions involving more than four instalments

---

[29] Senate Hearings on S. 1740, 87th Cong., 1st Sess., *supra,* n. 27, at 447–448. See also Senate Hearings on S. 1740, 87th Cong., 2d Sess., *supra,* n. 27, at 45.

[30] 33 Fed. Reg. 15506–15516 (1968).

[31] 34 Fed. Reg. 2002–2011 (1969).

[32] Compare § 226.2 (h), 33 Fed. Reg. 15507 (1968), with § 226.2 (k), 34 Fed. Reg. 2003 (1969).

under the Regulation since without this provision the practice of burying the finance charge in the cash price, a practice which already exists in many cases, would have been encouraged by Truth in Lending. Obviously this would have been directly contrary to Congressional intent." [33]

Furthermore, even as to sales in which it was impossible to determine what, if any, portion of the price recompensed the creditor for deferring payment, the regulation at least required that the consumer be provided with some information which would enable him to make an informed economic choice.[34]

## II

The standard to be applied in determining whether the Board exceeded the authority delegated to it under the Truth in Lending Act is well established under our prior cases. Where the empowering provision of a statute states simply that the agency may "make . . . such rules and regulations as may be necessary to carry out the provisions of this Act," [35] we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation." *Thorpe* v. *Housing Authority of the City of Durham,* 393 U. S. 268, 280–281 (1969). See also *American Trucking Assns.* v. *United States,* 344 U. S. 298 (1953).

---

[33] Federal Reserve Board Advisory Letter of Mar. 3, 1970, by J. L. Robertson. See also Federal Reserve Board Advisory Letter of Aug. 26, 1969, by J. L. Robertson.

[34] Statement of J. L. Robertson, Vice Chairman, Board of Governors of the Federal Reserve System, in Hearings on Consumer Credit Regulations before the Subcommittee on Consumer Affairs of the House Committee on Banking and Currency, 91st Cong., 1st Sess., pt. 2, pp. 380–381 (1969).

[35] *E. g.,* § 8 of the United States Housing Act of 1937, as amended, 42 U. S. C. § 1408.

We have also construed enabling provisions similar to § 105 of the Truth in Lending Act, in which Congress has stressed the agency's power to counteract attempts to evade the purposes of a statute. In *Gemsco, Inc. v. Walling,* 324 U. S. 244 (1945), we were asked to determine whether the Administrator of the Wage and Hour Division of the Department of Labor was empowered under the Fair Labor Standards Act of 1938 [36] to prohibit companies from allowing or requiring their employees to do industrial homework. The Act required the Administrator to approve orders which were designed to raise the minimum wage to 40 cents an hour. While the Act did not specifically mention industrial homework, § 8 (f) stated that the Administrator's orders

> "shall contain such terms and conditions as the Administrator finds necessary to carry out the purposes of such orders, to prevent the circumvention or evasion thereof, and to safeguard the minimum wage rates established therein." [37]

After hearings, the Administrator determined that homework furnished "a ready means" of evading his orders, and prohibited certain companies subject thereto from employing this means of production. The Court concluded that the Administrator had not exceeded his authority under the Act, noting that a more restrictive interpretation of the enabling provision would have rendered the Act inoperable. Focusing on the mandate provided by § 8 (f), the Court stated:

> "When command is so explicit and, moreover, is reinforced by necessity in order to make it operative, nothing short of express limitation or abuse of discretion in finding that the necessity exists should undermine the action taken to execute it. When

---

[36] 52 Stat. 1060.

[37] 52 Stat. 1065.

neither such limitation nor such abuse exists, but the necessity is conceded to be well founded in fact, there would seem to be an end of the matter." 324 U. S., at 255.

In light of our prior holdings and the legislative history of the Truth in Lending Act, we cannot agree with the conclusion of the Court of Appeals that the Board exceeded its statutory authority in promulgating the Four Installment Rule. Congress was clearly aware that merchants could evade the reporting requirements of the Act by concealing credit charges. In delegating rulemaking authority to the Board, Congress emphasized the Board's authority to prevent such evasion. To hold that Congress did not intend the Board to take action against this type of manipulation would require us to believe that, despite this emphasis, Congress intended the obligations established by the Act to be open to evasion by subterfuges of which it was fully aware. As in *Gemsco,* the language of the enabling provision precludes us from accepting so narrow an interpretation of the Board's power.

Given that some remedial measure was authorized, the question remaining is whether the measure chosen is reasonably related to its objectives. We see no reason to doubt the Board's conclusion that the rule will deter creditors from engaging in the conduct which the Board sought to eliminate. The burdens imposed on creditors are not severe, when measured against the evils which are avoided. Furthermore, were it possible or financially feasible to delve into the intricacies of every credit transaction, it is clear that many creditors to whom the rule applies would be found to have charged for deferring payment, while claiming they had not. That some other remedial provision might be preferable is irrelevant. We have consistently held that where reasonable minds may differ as to which of several remedial measures should

be chosen, courts should defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority. *Northwestern Co.* v. *FPC,* 321 U. S. 119, 124 (1944); *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 224 (1943); *American Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232, 236 (1936).

Respondent contends, however, that the Four Installment Rule must be abrogated since it is "inconsistent" with portions of the enabling statute. The purported conflict arises because the statute specifically mentions disclosure only in regard to transactions in which a finance charge is in fact imposed,[38] although the rule requires disclosure in some cases in which no such charge exists. Respondent argues that, in requiring disclosure as to some transactions, Congress intended to preclude the Board from imposing similar requirements as to any other transactions.

To accept respondent's argument would undermine the flexibility sought in vesting broad rulemaking authority in an administrative agency. In *American Trucking Assns.* v. *United States, supra,* we noted that it was not

> "a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected. . . . [N]o great acquaintance with practical affairs is required to know that such prescience, either in fact or in the minds of Congress, does not exist. Its very absence, moreover, is precisely one of the reasons why regulatory agencies such as the Commission are created, for it is the fond hope of their authors that

---

[38] § 103 (f), 15 U. S. C. § 1602 (f); § 121, 15 U. S. C. § 1631; § 130 (a), 15 U. S. C. § 1640 (a).

they bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess." 344 U. S., at 309–310 (citations omitted).

Neither the sections of the Truth in Lending Act which refer specifically to transactions involving finance charges nor any other sections of the Act indicate that Congress attempted to list comprehensively all types of transactions to which the Board's regulations might apply. To the contrary, § 105's broad grant of rulemaking authority reflects an intention to rely on those attributes of agency administration recognized in *American Trucking*. We cannot then infer that references in the Act to transactions involving credit charges were intended to limit the deterrent measures which the Board might choose.

Since the deterrent effect of the challenged rule clearly implements the objectives of the Act, respondent's contention is reduced to a claim that the rule is void because it requires disclosure by some creditors who do not charge for credit and thus need not be deterred. The fact that the regulation may affect such individuals does not impair its otherwise valid purpose. A similar contention was made in *Gemsco,* and rejected by the Court. Gemsco claimed that the Administrator was not attempting to enforce the requirements of the statute but was attempting to advance "experimental social legislation" which Congress had not approved. Responding to that argument the Court stated:

"Section 8 (f), in directing the Administrator to include 'such terms and conditions' as he 'finds necessary to carry out the purposes of such orders,' did not forbid him to take the only measures which would be effective, merely because other consequences necessarily would follow. The language neither states

expressly nor implies that he is to do only what will achieve the stated ends and nothing more. The statute does not direct the Administrator to make the rate effective by all necessary means except those which may have other social or economic consequences." 324 U. S., at 257.

There the Court was referring to the regulation of subject matter not specifically mentioned in the enabling legislation. A similar rule applies when a remedial provision requires some individuals to submit to regulation who do not participate in the conduct the legislation was intended to deter or control. In *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 388–389 (1926), the Court held that, in defining a class subject to regulation, "[t]he inclusion of a reasonable margin to insure effective enforcement, will not put upon a law, otherwise valid, the stamp of invalidity." See also *North American Co.* v. *SEC,* 327 U. S. 686 (1946). Nothing less will meet the demands of our complex economic system. Where, as here, the transactions or conduct which Congress seeks to administer occur in myriad and changing forms, a requirement that a line be drawn which insures that not one blameless individual will be subject to the provisions of an act would unreasonably encumber effective administration and permit many clear violators to escape regulation entirely. That this rationale applies to administrative agencies as well as to legislatures is implicit in both *Gemsco* and *American Trucking Assns.* In neither case was every individual engaged in the regulated activity responsible for the specific consequences the agency sought to eliminate.

Respondent argues that such an interpretation of the Truth in Lending Act is inconsistent with our holding in *FCC* v. *American Broadcasting Co.,* 347 U. S. 284 (1954). In that case, the Court considered whether, in

establishing regulations to govern programing, the FCC had properly interpreted a criminal provision prohibiting the broadcasting of lotteries. After noting that a given statute could not be construed one way for purposes of an administrative proceeding and another for criminal prosecution, the Court stated:

> "If we should give [the criminal provision] the broad construction urged by the Commission, the same construction would likewise apply in criminal cases." *Id.*, at 296.

Since, in drafting its regulation, the Commission had failed to apply the well-established rule that penal provisions must be construed narrowly, the Court held the regulation invalid.

Relying on *American Broadcasting*, respondent contends that the Truth in Lending Act must be construed narrowly since it contains penal provisions,[39] and that a narrow interpretation requires that the Board's rule be nullified. We cannot agree, however, that every section of an act establishing a broad regulatory scheme must be construed as a "penal" provision, as that term is used in *American Broadcasting*, merely because two sections of the Act provide for civil and criminal penalties. Penal statutes are construed narrowly to insure that no individual is convicted unless "a fair warning [has first been] given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931).[40] Where, as here, the language of the challenged rule is explicit, that risk is not present. See *Kraus & Bros., Inc.* v. *United States*, 327 U. S. 614, 621–622 (1946).

---

[39] § 112, 15 U. S. C. § 1611; § 130, 15 U. S. C. § 1640.

[40] See *Kordel* v. *United States*, 335 U. S. 345 (1948). See also W. LaFave & A. Scott, Criminal Law 72 (1972).

We are also unable to accept respondent's argument that § 130[41] does not allow imposition of a civil penalty in cases where no finance charge is involved but where a regulation requiring disclosure has been violated. Section 130 provides that the penalty assessed shall be twice the amount of the finance charge imposed, but not less than $100. Since the civil penalty prescribed is modest and the prohibited conduct clearly set out in the regulation, we need not construe this section as narrowly as a criminal statute providing graver penalties, such as prison terms. We have noted above that the objective sought in delegating rulemaking authority to an agency is to relieve Congress of the impossible burden of drafting a code explicitly covering every conceivable future problem. Congress cannot then be required to tailor civil penalty provisions so as to deal precisely with each step which the agency thereafter finds necessary. In light of the emphasis Congress placed on agency rulemaking and on private and administrative enforcement of the Act, we cannot conclude that Congress intended those who failed to comply with regulations to be subject to no penalty or to criminal penalties alone. As the District Court concluded, imposition of the minimum sanction is proper in cases such as this, where the finance charge is nonexistent or undetermined.

Finally, the Four Installment Rule does not conflict with the Fifth Amendment under our holdings in *Schlesinger* v. *Wisconsin*, 270 U. S. 230 (1926), and

---

[41] 15 U. S. C. § 1640. This section refers only to the failure to provide "information required *under this part* to be disclosed . . . ." (Emphasis supplied.) The italicized language was added to the statute to distinguish disclosure required in regard to sales transactions from that required in regard to advertising. H. R. Rep. No. 1040, *supra*, n. 18, at 19, 30. The penalty provision applies both to the failure to disclose information specifically required by the statute and to the failure to abide by regulations promulgated by the Board to govern such disclosure.

*Heiner* v. *Donnan*, 285 U. S. 312 (1932). In *Schlesinger* and *Heiner*, we held that certain taxing provisions violated the Due Process Clauses of the Fifth and Fourteenth Amendments because they conclusively presumed the existence of determinative facts. The challenged rule contains no comparable presumption. The rule was intended as a prophylactic measure; it does not presume that all creditors who are within its ambit assess finance charges,[42] but, rather, imposes a disclosure requirement on all members of a defined class in order to discourage evasion by a substantial portion of that class.

The Truth in Lending Act reflects a transition in congressional policy from a philosophy of "Let the buyer beware" to one of "Let the seller disclose." By erecting a barrier between the seller and the prospective purchaser in the form of hard facts, Congress expressly sought "to . . . avoid the uninformed use of credit." 15 U. S. C. § 1601. Some may claim that it is a relatively easy matter to calculate the total payments to which petitioner was committed by her contract with respondent; but at the time of sale, such computations are often not encouraged by the solicitor or performed by the purchaser. Congress has determined that such purchasers are in need of protection; the Four Installment Rule serves to insure that the protective disclosure mechanism chosen by Congress will not be circumvented.

That the approach taken may reflect what respondent views as an undue paternalistic concern for the consumer is beside the point. The statutory scheme is within the power granted to Congress under the Commerce Clause.

---

[42] In regard to some transactions to which the Four Installment Rule applies, merchants need not report the amount and rate of finance charges. Federal Reserve Board Advisory Letter of July 24, 1969, by J. L. Robertson; Federal Reserve Board Letter No. 30, July 8, 1969, by Frederic Solomon.

It is not a function of the courts to speculate as to whether the statute is unwise or whether the evils sought to be remedied could better have been regulated in some other manner.

*Reversed and remanded.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST concur, dissenting in part.

I have concluded that this is not a proper case for summary judgment under Fed. Rule Civ. Proc. 56 (c), which provides that summary judgment only may be granted if there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." As I interpret the present record in light of our decisions, see, *e. g., Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144; *White Motor Co.* v. *United States,* 372 U. S. 253; *United States* v. *Diebold, Inc.,* 369 U. S. 654, there remains unresolved a genuine issue of material fact. Although I agree with the majority that Regulation Z is valid and accordingly would reverse the decision of the Court of Appeals, I would remand this case to the District Court for resolution of that material issue.

The disclosure provisions of the Truth in Lending Act apply only to an extension of "consumer credit." 15 U. S. C. § 1631. Thus, in order to assert successfully a claim under the Act for the statutory penalty and reimbursement for the costs of the action, see *id.,* § 1640, petitioner, *inter alia,* must satisfy her burden of proving that respondent extended consumer credit within the meaning of the Act. Section 103 (e) of the Act, 15 U. S. C. § 1602 (e), defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." In her complaint, petitioner merely alleges that respondent "extends Consumer Credit as defined in Regulation Z, 12 C. F. R. [§] 226.2

(K) . . . ." Respondent denies in its answer that its contract with petitioner involved a "credit transaction." In one paragraph respondent avers: "Under the contract executed by the customer and Defendant, the customer agrees to pay a stated amount per month for half of the life of the contract and Defendant agrees to supply the magazines for the full term of the contract. At all times the customer has prepaid for the magazines to be delivered. Under its arrangement with most of the publishers, Defendant reimburses the publisher periodically during the full term of the subscription." In another paragraph it avers: "At no point during the life of the contract has Defendant paid money to a third person or supplied goods or services to the customer for which reimbursement is expected from the customer in the future."

On the basis solely of these allegations, one would conclude that the contract between the petitioner and the respondent did not constitute a credit transaction. If respondent merely collected $3.95 per month from each customer and sent the receipts periodically to the publisher,[1] less the respondent's commission, respondent never would have made any advances for the customer, and the customer would owe nothing to the respondent for the loan of money or, in the words of the Act, as a "finance charge." On the other hand, if respondent advanced all or part of the subscription price to the publishers, respondent would be advancing "credit" for the benefit of the customer.[2] The legislative history indi-

---

[1] There are suggestions in the record that respondent is a wholly owned subsidiary of Time, Inc. Respondent, however, sold not only Life, a Time, Inc., publication, but magazines of other publishers.

[2] In a free-enterprise system, one must presume that there is a "finance charge" for the advance of credit. It would nonetheless be a "finance charge" although it were wholly undisclosed or not separately stated in an account rendered to the customer.

cates that "the disclosure requirement would not apply to transactions which are not commonly thought of as credit transactions . . . ."[3] As Professor Corbin has stated: "A transaction may be an instalment contract without being a credit transaction at all. Both parties may agree to perform in instalments without promising to render any performance-in-advance of full payment of the price of each instalment so rendered."[4] The Act, in defining "credit," refers to the deferred payment of a "debt." A debt, however, is more than a binding contractual obligation to pay a sum of money in the future upon the performance of certain conditions by the other party to the contract. It is an unconditional obligation to pay.[5] Thus, in my view, a proper resolution of the issue whether respondent extended credit to petitioner depends, at least in part, on the contractual relationships between the respondent and the publishers. The contracts between respondent and the publishers are not in the present record.[6]

---

[3] S. Rep. No. 392, 90th Cong., 1st Sess., 14; H. R. Rep. No. 1040, 90th Cong., 1st Sess., 25.

[4] 3A A. Corbin, Contracts § 687, p. 246 (1960). A published opinion of the Federal Reserve Board recognizes that installment payment plans may not involve an extension of credit when charges for services rendered do not exceed prior payments. FRB Opinion Letter No. 262 (1970).

[5] 3A A. Corbin, Contracts § 691 (1960).

[6] My Brother POWELL asserts that, given the undisputed fact that petitioner agreed to pay in advance, respondent as a matter of law could not have extended credit. *Post*, at 383–384. We do not, however, know what the financial relationships in this *tripartite* arrangement are. For example, it may be that respondent advances the full five-year subscription price to the publisher on the subscriber's behalf when the contract between the subscriber and respondent is executed. If that is so, the subscriber may receive an *unconditional* right to receive magazines from the publisher over the five-year period, whether or not he meets his contractual obligations with respondent. Under these circumstances, respondent will be acting as a financier,

The pleadings, of course, are not the only papers to be considered by the District Court in determining whether one party or the other is entitled to summary judgment. Under Rule 56 (c) the court must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . ." During the collection period, respondent had sent petitioner a dunning letter reminding her "that we have ordered these magazines in advance and that you have incurred an obligation to repay us. *This is a credit account,* and as such must be repaid by you on a monthly basis, much the same as if you had purchased any other type of merchandise on a monthly budget plan." Respondent formally admitted that it had sent this letter to petitioner. Accordingly, it was properly considered by the District Judge.[7] But, I do not view this "ad-

---

enabling the subscriber to take advantage of the publisher's five-year subscription offer, but yet to defer payment on the subscription price. Any "profit" respondent receives will be largely attributable to its services as a financier. I do not see that such a financial arrangement differs substantially from the case where a subscriber borrows the full subscription price from a bank and pays the publisher directly, obligating himself to repay the bank in equal installments, with interest, over two and one-half years. As my Brother Powell argues, the subscriber under those circumstances will be advancing credit to the publisher because he has paid for all magazines in advance, but it cannot be doubted that at the same time the bank has advanced credit to the subscriber.

[7] Respondent mailed another letter to petitioner which stated: "Whereas, FPS, acts initialy [*sic*] as agent for the various publishers; upon acceptance of her contract, FPS thereafter acts solely as financier, and co-guaranter [*sic*] of service with the various publishers; whereas, FPS, has fully invested in Mrs. Mourning's contract and does not receive refund in part or full from any, or, all publishers; for said FPS, investment, we therefore, must insist on compliance of your client to the terms of said contract . . . ." Although respondent admitted that the letter appeared on its stationery and was written by an employee, it denied that the employee

mission" as conclusive or sufficient proof that respondent had extended credit within the meaning of the Act at the time the contract between petitioner and respondent was entered into.[8] First, this is not an admission in terms that credit was extended within the meaning of the Act. Second, since petitioner at the time the letter was sent was three months in arrears, it may be that respondent had advanced money on her account only after she failed to meet her contractual obligation. It is settled under our decisions that material lodged by the moving party "must be viewed in the light most favorable to the opposing party." *Adickes* v. *Kress & Co.*, 398 U. S., at 157, 158–159; *United States* v. *Diebold, Inc.*, 369 U. S., at 655.

Respondent is not deprived of the benefit of this principle of interpretation merely because it did not file an affidavit controverting the contents of the letter. Rule 56 (e) provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." The Advisory Committee note on the amendment which added this provision to the Rule, however, stated that "[w]here the evidentiary matter in support of the mo-

---

was authorized to send the letter. Accordingly, since there was an issue of fact whether the letter was authorized and thus a binding admission, the letter could not be considered properly on petitioner's motion for summary judgment. Cf. 3 W. Barron & A. Holtzoff, Federal Practice and Procedure § 1231, p. 75 (1971 Supp.).

[8] We need not resolve here whether, if the contract was not originally a credit transaction, petitioner's own breach could have converted it retroactively into a credit transaction within the meaning of the Act.

tion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." We cited this comment with approval in *Adickes* v. *Kress & Co., supra,* at 160. The moving party, in this case petitioner,[9] must meet her burden of showing the absence of a genuine issue as to any material fact. *Id.,* at 157. I cannot conclude that she met that burden. The District Judge was not possessed of sufficient information to resolve properly the issue whether credit had been extended. Under these circumstances, he should not have granted summary judgment. Cf. *White Motor Co.* v. *United States,* 372 U. S., at 263.

MR. JUSTICE POWELL, dissenting.

I would affirm the judgment of the Court of Appeals on the ground that there was no extension of consumer credit within the meaning of the Truth in Lending Act.[1] The majority takes the position that the credit issue is a question of fact properly resolved against respondent on petitioner's motion for summary judgment below. I cannot agree. In my view, the undisputed facts establish as a matter of law that the transaction between peti-

---

[9] Both parties moved for summary judgment. That does not relieve the District Judge of his responsibility to consider each motion separately in light of the theories advanced by each party and to proceed to trial if he concludes that there is a genuine issue of material fact to be resolved. See 6 J. Moore, Federal Practice ¶ 56.13 (2d ed. 1972).

[1] Having this view of the case, I find it unnecessary to address the other two issues, namely: (i) whether the Federal Reserve Board exceeded its authority in adopting Regulation Z, which extends the coverage of the Act to transactions in which no finance charge can be identified; and (ii) whether the civil penalty provision of 15 U. S. C. § 1640 (a) may validly be imposed in a case where, by concession of the parties on cross-motions for summary judgment, the transaction does not involve a finance charge.

384

tioner and respondent did not involve an extension of consumer credit. For the same reason, while I am in agreement with much of Mr. Justice Douglas' dissenting opinion, I see no reason to remand the case for the taking of evidence.

I

Clearly the Act applies only to transactions involving the extension of credit. The congressional declaration of purpose is explicit:

> "The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit." 15 U. S. C. § 1601.

The phrase "extension of consumer credit" is not defined in the Act. Nor does the Act's definition of "credit" provide any enlightenment.[2] However, a transaction is commonly understood to involve credit when one party receives value in exchange for his unconditional promise to pay the other party for such value in the future. The mere fact that a party obligates himself in a contract to pay for goods or services in installments over a period of time does not render the contract a credit transaction:

> "A transaction may be an instalment contract without being a credit transaction at all. Both parties may agree to perform in instalments without prom-

---

[2] "The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U. S. C. § 1602 (e). The Act provides no gloss on the terms "debtor" and "debt," and the definition of "creditor" is limiting rather than explanatory. ("The term 'creditor' refers only to creditors who regularly extend, or arrange for the extension of, credit for which the payment of a finance charge is required . . . ." 15 U. S. C. § 1602 (f).)

ising to render any performance in advance of full payment of the price of each instalment so rendered." 3A A. Corbin, Contracts § 687, p. 246 (1960).

The transaction before the Court may well have been a credit transaction, but it was not *respondent* that extended the credit. Petitioner obligated herself to pay in advance for the magazines she was to receive. The contract required petitioner to pay equal installments over a 30-month period, but respondent was obligated only to provide magazines over 60 months. In effect, petitioner paid every month for two months' worth of magazines. Until the last magazine had been delivered, petitioner would have paid for more magazines than she received. Thus, the contract called for the extension of credit by petitioner to respondent. For this reason it was not an "extension of consumer credit" within the meaning of the Act. See 15 U. S. C. § 1602 (h).

The Federal Reserve Board, upon whose authority to interpret the Act the majority so heavily relies in sustaining Regulation Z, has indicated that a necessary element in a consumer credit transaction is the consumer's obligation to pay *after* he has received the bargained-for goods or services. In a published Opinion Letter dealing with the practice of assessing obstetrical services in periodic installments, the Board stated that "[a]s long as there are no finance charges assessed, *and at no point do the charges for the services rendered exceed the payments to the extent that it would require more than 4 of the periodic instalments to repay the obligation,* then the plan would not fall within the provisions of Regulation Z." [3] (Emphasis supplied.) This statement implicitly recognizes that credit is extended only when the

---

[3] FRB Opinion Letter No. 262 (1970); 4 CCH Consumer Credit Guide ¶ 30,516.

value of goods or services provided exceeds the payments
made.[4]

## II

Implicit in the positions both of MR. JUSTICE DOUGLAS
and of the majority is the assumption that, even ad-
mitting petitioner was to pay for each magazine before
receiving it, under some factual circumstances respondent

---

[4] Legislative history bolsters the view that Congress assumed
"credit" meant the receipt of goods or services in advance of paying
for them. In earlier versions of the Act, the definition of credit
included "any contract . . . of sale of property or services, either
for present or future delivery, under which part or all of the price is
payable subsequent to the making of such sale or contract; . . .
any contract or arrangement for the hire, bailment, or leasing of
property . . . ." S. 1740, 87th Cong., 1st Sess.; S. 5, 90th Cong., 1st
Sess. (as introduced Jan. 11, 1967). During the Senate hear-
ings, a question was raised as to whether any finance charge would
be attributable to certain included transactions, particularly ordinary
bailment and lease arrangements. Hearings on S. 5 before the Sub-
committee on Financial Institutions of the Senate Committee on
Banking and Currency, 90th Cong., 1st Sess., 663 (1967) (statement
of J. L. Robertson, Vice Chairman, Board of Governors of the Fed-
eral Reserve System). This criticism was heeded and the final ver-
sion of the bill substituted the language now found in the Act (15
U. S. C. § 1602 (e)) with the following explanation: "The original
S. 5 language was deleted because it was somewhat cumbersome and
sweeping and referred to various types of lease situations which
might not be true extensions of credit." S. Rep. No. 392, 90th
Cong., 1st Sess., 12 (1967). In fact a lease, like the "paid during
service" magazine contracts offered by respondent, often imposes a
noncancellable obligation on the lessee or consumer to pay in a
series of installments. Yet the lessor does not extend credit be-
cause the lessee ordinarily pays in advance for each period during
which he enjoys the use of the property. Petitioner, by the same
reasoning, was no more the recipient of credit than is the ordinary
lessee or bailee. It would be inconsistent with this legislative his-
tory to read "extension of credit" to include every noncancellable
installment obligation.

might nevertheless have extended credit.[5] Thus, MR. JUSTICE DOUGLAS states that "if respondent advanced all or part of the subscription price to the publishers, respondent would be advancing 'credit' for the benefit of the customer." The majority is less clear on this point, stating only that "[i]n some cases in which a consumer pays in installments for a magazine subscription, credit may not have been extended to the consumer." *Ante*, at 362 n. 16. The implication, however, is that in some such transactions, though the consumer pays for the magazines in advance, he may be the recipient of credit. I am unable to agree that under any set of circumstances, given the undisputed fact that petitioner agreed to pay in advance for each magazine, respondent might have extended credit. Petitioner did not obtain a loan from respondent which she would be unconditionally obligated to repay. She entered into a contract imposing continuing, mutually dependent obligations on both parties.[6]

---

[5] The District Court found that there was no issue as to any material fact in this case. The Court of Appeals did not disturb this finding. Whether one agrees with this finding as does the majority or disagrees for reasons stated by MR. JUSTICE DOUGLAS, the District Court's conclusion that the uncontroverted facts establish a consumer credit transaction is clearly a conclusion of law and therefore is entitled to no presumption of correctness. Nor do respondent's dunning letters to petitioner describing her obligation as a credit account create any such presumption. Again, such statements only express a legal conclusion and do not establish the existence of a consumer credit transaction within the meaning of the Act.

[6] If respondent failed to deliver the magazines as agreed prior to completion of the specified payments, petitioner would have no further obligation to pay:

"A contract for the sale of goods may be an instalment contract with respect to the goods sold as with respect to payments of the price. The non-delivery of an instalment or delivery of a nonconforming instalment when required by the contract is a breach for which an action can be maintained at once. There is no doubt also

Whether respondent advanced any part of the subscription price to magazine publishers is quite immaterial to a determination of the legal effect of the only transaction involved in this case: whether there was extension of consumer credit by *respondent* to *petitioner*. The only contract at issue is that between the parties; how and upon what terms respondent may have arranged to obtain the magazines for delivery to petitioner in fulfillment of its contractual obligations is of no concern to petitioner. Nor can any such arrangement by respondent with a third party change the nature of the transaction between the parties to this litigation.[7]

The controlling facts therefore are not in dispute, having been admitted by the cross-motions for summary judgment, and I can perceive of no way in which they can be construed as an extension of consumer credit by respondent to petitioner. A remand, unnecessarily burdening the parties and the court below, would serve no useful purpose. As a matter of law respondent did not extend credit within the meaning of the Truth in Lending Act. I would affirm the judgment below.

---

that the buyer is privileged to withhold payment of the price of the undelivered instalment or of a nonconforming instalment that is rightfully rejected. . . . [T]he buyer does not have to extend such credit [beyond that which was agreed upon] to the seller by making payments without receiving the agreed goods." 3A A. Corbin, Contracts § 691, p. 264 (1960). See Fla. Stat. Ann. §§ 672.2–612, 672.2–711, 672.2–717 (1966).

[7] Indeed, petitioner's complaint avers that the installment contract for the purchase and sale of the magazines is "the only instrument executed and existing between the parties," and that respondent thereby "extend[ed] Consumer Credit as defined in Regulation Z . . . ." There is no allegation as to extension of credit by the publishers or by any third person. Second Amended Complaint, App. 3, 4.