**Michael ALEXANDER, et al., Plaintiffs,**

v.

**TRUSTEES OF BOSTON UNIVERSITY, et al., Defendants.**

**Civ. A. No. 83–986–K.**

United States District Court, D. Massachusetts.

April 11, 1984.

William Southard, James B. Re, E. Susan Garsh, Bingham, Dana & Gould, Marjorie Heins, John Reinstein, Mass. Civil Liberties Union Foundation, Boston, Mass., for plaintiffs.

Gerald L. Neuman, Peter B. Ellis, Foley, Hoag & Eliot, William Burnett Harvey, Boston, Mass., for defendants.

Memorandum and Order

KEETON, District Judge.

Plaintiffs are students of the Boston University ("BU") School of Theology. They claim that their religious liberties are being violated by the operation of Department of Education ("DOE") regulations which condition the receipt of federal aid on the completion of a statement declaring the applicant's draft status. The regulations, printed at 48 Fed.Reg. 15, 581–84 (1983) (to be codified at 34 C.F.R. § 668.24–27), require any student seeking federal educational aid to complete a statement certifying that the student either has registered with the Selective Service or, because of age, gender, prior service or nationality, is not required to register. These regulations were adopted to implement the so-called Solomon Amendment, Department of Defense Authorization Act of 1983, § 1113(f), 50 U.S.C.App. § 462(f), which denies federal educational assistance to students who must register for the draft, but have failed to do so. Plaintiffs are also suing BU, to enjoin both its participation in the enforcement of the regulations and its own policy of denying aid from non-federal sources to students who do not complete the statement.

The plaintiffs, all of whom are studying for the ministry, are members of the United Methodist Church. They claim that their religious beliefs prevent them from cooperating in a system of peacetime military conscription. Plaintiffs point to teachings of their church which oppose peacetime conscription and "support those individuals ... who therefore refuse to serve in the armed forces or to cooperate with systems of military conscription." United Methodist Church Book of Discipline at 101, Docket No. 1, Ex. D. All three plain-

tiffs are exempt from the draft registration requirement, one because he is over 25 years old, the other two because they are women. If they refuse to complete the form, they will lose all financial aid for the coming school year. Without this aid, plaintiffs say they will be unable to continue their education.

The motion has been submitted to this court on the papers filed by the parties.[1] Although defendants' submissions indicate that at trial they may challenge plaintiffs' assertions that their positions are motivated by religious principle, I find on the affidavits submitted that plaintiffs have shown a high probability that they will prevail on this fact question.

## I.

In deciding whether to grant a preliminary injunction, the court must consider (1) whether plaintiff will suffer irreparable injury if the injunction is not granted; (2) whether such injury outweighs any harm to defendant; (3) whether plaintiff has exhibited a likelihood of success on the merits; and (4) whether the public interest will be adversely affected. *LeBeau v. Spirito*, 703 F.2d 639 (1st Cir.1983). I will consider first the question whether plaintiffs have demonstrated a likelihood of success on the merits.

## II.

■ Plaintiffs argue that the regulations are an impermissible exercise by the Secretary of Education of authority delegated to him by Congress. The Solomon Amendment states that all registration-eligible students must file a registration compliance statement. 50 U.S.C.App. § 462(f)(2). The Secretary is also authorized to issue regulations implementing the law. *Id.* § 462(f)(4). The Secretary's regulations extend the filing requirement to registration-exempt students. They further state

that anyone who fails to file the statement will lose aid.

In reviewing administrative regulations issued pursuant to such a delegation of authority, the court must consider whether the regulation is "reasonably related to the enabling legislation." *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973). "This agency power to make rules that affect substantial individual rights and obligations carries with it the responsibility ... to remain consistent with the governing legislation ...." *Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1973). The Secretary's regulations can not exceed the statutory authority by going beyond recognized limits to the congressional mandate. *Batterton v. Francis*, 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448 (1977). "What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown*, 441 U.S. 281, 308, 99 S.Ct. 1705, 1721, 60 L.Ed.2d 208 (1979).

■ In this case, the statutory purpose was clear: to deny federal educational assistance to those young men who were required to register for the draft, yet had not done so. As supporters of the amendment stated during debate in both chambers of Congress, the statute had a narrow reach. Only those who had already broken a criminal law by not registering for the draft were to suffer the sanction of loss of aid. *See, e.g.,* 128 Cong.Rec. H4757 (daily ed. July 28, 1982) (remarks of Rep. Mitchell). The delegation to the Secretary of power to make regulations was thus limited by the purpose of the authorizing statute itself.

The Secretary, however, did not simply effectuate the Congressional determination that aid should be denied to those registration-eligible young men who had broken

---

1. BU has opposed plaintiffs' motion for leave to file a reply memorandum on the preliminary injunction. Docket Nos. 35, 39. I conclude that it is proper for me to consider the reply memo-

randum. Given the difficult nature of the questions presented by this litigation, I welcome full briefing of the issues.

the law. Instead, he established a new ground for denial of aid: failure to comply with an administrative requirement that all applicants for aid file a registration compliance statement. In other words, the sanction that Congress reserved for a small group of lawbreakers was imposed by the Secretary on a potentially much larger group of persons who have not broken any law and who have met all the statutory requirements for aid. The imposition of this sanction on those persons is beyond the power delegated by Congress.

The only justification the Secretary has offered for this action is administrative convenience. Based on the unsupported assumption that "some institutions may not have a record of the student's gender or date of birth," the Secretary decided that, "to minimize the burden on the institution," each student would be required to provide the information about registration status. 48 Fed.Reg. 15,578 (1983). He did not attempt to assess the cost of having schools ascertain the required information. Nor has he demonstrated that less drastic means of compensating for this cost—for instance, charging a reasonable processing fee or delaying, to allow for investigation, the disbursement of aid to students who decline to provide a compliance statement— were considered and rejected for reasons consistent with the statutory mandate. It may be doubted that there will be many instances where a school does not know the age or gender of a student. In the present case, BU possesses that information.

Given the nature of the interest served by requiring the statement, and the small cost created by non-compliance, the sanction of denying aid to fully qualified persons simply because they fail to file the statement is disproportionately harsh. Even when an administrative agency is authorized by statute to impose sanctions, a court may overturn that decision if it finds the sanction " 'unwarranted in law or ... without justification in fact.' " *Butz v. Glover Livestock Commission,* 411 U.S. 182, 185–186, 93 S.Ct. 1455, 1457–1458, 36 L.Ed.2d 142, *reh. denied,* 412 U.S. 933, 93 S.Ct. 2746, 37 L.Ed.2d 162 (1973). This

occurs when "the relationship between the remedy adopted and the stated reasons for its adoption is so tenuous that we deem the order a gross abuse of the [agency's] remedial authority." *Beck v. SEC,* 430 F.2d 673, 675 (6th Cir.1970). Sanctions that are among those authorized by statute have been held to be impermissibly harsh as applied in particular instances. *See Arthur Lipper Corp. v. SEC,* 547 F.2d 171 (2d Cir.1976), *reh. denied* 551 F.2d 915 (1977), *cert. denied* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978); *Power v. United States,* 531 F.2d 505, 509, 209 Ct.Cl. 126 (1976), *cert. denied* 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980).

The regulatory sanction at issue here has two characteristics that make it even more objectionable than the sanctions set aside in the foregoing cases as disproportionately harsh. First, the Secretary has directed uniform application of the sanction of denial of Title IV benefits in circumstances beyond those for which the use of this sanction was authorized by statute. Second, this sanction is even more clearly disproportionate when applied to those whose violations of the regulations are founded on religious principle. In this case, the Secretary was authorized only to ensure that the statutory mandate of the Solomon Amendment was enforced. Instead, the Secretary went beyond that limited mandate and made his own rules uniformly denying Title IV benefits to persons in violation of his rules, though qualified for those benefits under statutory standards. This action was unwarranted by law and was so far beyond delegated authority as to be arbitrary and capricious.

The unwarranted nature of the Secretary's action is underscored by the fact that, even though the Solomon Amendment made no reference to registration-exempt students, the regulations deny aid to persons like plaintiffs, who refuse on the basis of religious principle to complete the compliance form. Members of Congress debated the constitutional issues that were raised by a denial of aid to those who were required to register for the draft but did

not for religious reasons. *See* 128 Cong. Rec. H4758–4762. Denying aid to those whose only defense is refusal out of religious conviction to fill out a form stating that they are not required to register raises serious constitutional questions. I cannot conclude that Congress, after fully considering the constitutional implications of its own narrowly defined action, then delegated authority to the Secretary to make regulations of broader sweep that raise more troublesome constitutional problems. When personal liberties are at stake, "we will construe narrowly all delegated powers that dilute or curtail them." *Kent v. Dulles,* 357 U.S. 116, 129, 78 S.Ct. 1113, 1120, 2 L.Ed.2d 1204 (1957).

Another indication that the Secretary has stepped beyond his statutory authority is the fact that his regulations needlessly conflict with the Title IV educational aid program. In passing the Solomon Amendment, Congress gave considerable attention to the policy expressed in Title IV that aid should be available to all needy students who meet the eligibility requirements. *See, e.g.,* 128 Cong.Rec. S4943 (daily ed. May 12, 1982) (remarks of Sen. Mattingly). The sponsors of the amendment recognized that they were adding a new condition of eligibility for this aid. 128 Cong.Rec. H4757 (remarks of Rep. Solomon). The Secretary's regulations add yet another criterion for aid, one not anticipated by Congress and not necessary to achieve the limited purpose of the Solomon Amendment. Thus, they not only go beyond the reach of the Solomon Amendment but also impede the achievement of other statutory goals.

Having determined that the sanction imposed by the regulations is not supportable on any reasoned ground consistent with the statutory authorization, I need not determine whether it is vulnerable to allegations that it was affirmatively designed to serve constitutionally impermissible objectives. I hold only that a regulation of such broad sweep and harsh consequence is not germane to implementation of the Congressional mandate. Instead, when judged according to its relationship to the Congres-

sional mandate, it is so harsh and excessive as to be arbitrary and capricious.

This is not to say that, in the administration of this program, educational institutions are forbidden to request, or the Secretary is forbidden to require by regulation that they request, cooperation of financial aid applicants in the form this regulation defines. It is to say, however, that the Secretary has exceeded the Congressional authorization in imposing the penalty for noncooperation that this regulation imposes.

I note that my conclusion on this issue is inconsistent with the rationale of *Dickinson v. Bell,* 580 F.Supp. 432 (D.D.C.1984). That case may be distinguished on the facts, in that the plaintiffs whose aid was threatened were not claiming that they were unable to cooperate with the registration requirement because of religious principles. I note also that the court in *Dickinson,* while denying relief, did observe that the challenged action "in a very real sense places 'form' over substance and needlessly discourages achievement of the goals of the Higher Education Act." *Id.* at 435. For the reasons stated above, I reach a different conclusion on the legal question and decide that the sanction of disqualification from educational aid because of noncompliance with the Secretary's regulations is beyond Congressional authorization.

### III.

Turning to the other criteria for a preliminary injunction, I conclude that plaintiffs will suffer irreparable injury if the injunction is not granted. Without an injunction, they will soon be forced to make a choice between complying with federal regulations or abiding by their religious principles. Since there can be no price placed on religious principles, no remedy after the fact can repair the injury. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). Further, plaintiffs assert they will be forced to disrupt their education if they cannot obtain aid for the coming school year. Such an

interruption also constitutes an irremediable injury at stake here. *Cf. McLaughlin v. Massachusetts Maritime Academy,* 564 F.Supp. 809, 811 (D.Mass.1983) (expulsion from school).

I also conclude that the prospective injury to plaintiffs outweighs the harm to defendants that would result from an injunction. A preliminary injunction in this case only hastens an alteration in administrative procedures which I have already determined will likely be the result of this litigation. *SEC v. World Radio Mission, Inc.,* 544 F.2d 535, 540–42 (1st Cir.1976). I do not agree with BU's argument that the Supreme Court's decision to stay the injunction in *Selective Service v. Doe,* — U.S. ——, 103 S.Ct. 3574, 77 L.Ed.2d 1401 (1983), disposes of this question. The order in *Doe* enjoined the enforcement of the Solomon Amendment as applied to young men eligible for the draft. The order plaintiffs seek leaves intact the operation of that law and merely alters the means of administering it. Further, *Doe* rested on constitutional arguments completely unrelated to the arguments presented here. Subsequent Supreme Court action in that case is unlikely to be on grounds that would apply to plaintiffs' claims here.

Finally, I conclude that the public interest will not be adversely affected by this preliminary injunction. The order merely advances the time for the government to alter an administrative procedure in a way that conforms with Congressional authorization. It thus eliminates uncertainty and prevents an immediate infringement of plaintiffs' rights by an unlawful regulation.

IV.

Defendant BU has moved to be dismissed on a number of grounds. It is true, of course, that BU is in no way responsible for the DOE regulations. However, the injunction issued against the federal defendants will bind BU to the extent that it acts in concert with the federal defendants in denying federal financial aid to the plaintiffs.

In the second count, plaintiffs assert various state law claims against BU challenging its policy of denying non-federal aid to those who fail to file the registration statement. BU argues that the requirements for diversity jurisdiction over these claims are not met.

First, BU claims that complete diversity does not exist because plaintiff Alexander is registered to vote in Massachusetts. Yet other significant indicia of citizenship indicate that Alexander is a citizen of Ohio. Alexander is licensed to drive and registered to vote in Ohio, Docket No. 28 at 7; he intends to return to Ohio to practice his ministry and has an agreement to this effect with the Ohio Methodist Conference, which has provided him with scholarship funds. Docket No. 45 at 2. The fact that a student, living out-of-state, has registered to vote in the state of the school, does not defeat a claim of citizenship in the home state. *Lyons v. Salve Regina College,* 422 F.Supp. 1354 (D.R.I.1976), *rev'd on other grounds,* 565 F.2d 200 (1st Cir. 1977), *cert. denied* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978).

Further, BU claims that the amount in controversy is not $10,000. BU concedes that each plaintiff stands to lose about $2,500 in financial aid from university sources during the coming year, as a result of non-compliance with the challenged policy. Plaintiffs assert that loss of aid will cause them to suspend their education. This will mean delaying the time when they can assume jobs as ministers, causing both economic and non-pecuniary loss. Finally, there is a claimed non-pecuniary loss resulting from the fact that BU's policy allegedly coerces plaintiffs indirectly to abandon religious beliefs in order to get needed aid. The court may consider the value of intangible rights sought to be protected in an injunctive action against a private party. *Hirsch v. Jewish War Veterans,* 537 F.Supp. 242 (E.D.Pa.1982) (associational rights). Diversity is defeated if it "appears … 'to a legal certainty' that the claims … will not amount to the required $10,000 …. In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of that litigation."

*Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 346–47, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977). Here the court is satisfied that plaintiffs have met this burden.

Before proceeding to the plaintiffs' request for preliminary relief, I note that BU has indicated that, should the actions of the federal defendants in denying aid to plaintiffs be enjoined, BU will conform its policy to that order. Since one asserted basis for BU's decision to deny its aid to plaintiffs is their failure to obtain federal aid first, the injunction against federal defendants will satisfy that concern. The claims against BU present difficult issues of interpreting state law, which I will not unnecessarily attempt to resolve. Therefore, I defer decision on the prayer for a preliminary injunction against BU because of my understanding that such relief against BU will not be necessary. Should this understanding prove to be incorrect, plaintiffs may move for further relief.

An injunction, without security therefor, in accordance with this opinion will be issued forthwith. Counsel may confer on the form of the injunction and advise the court whether they are able to submit an agreed form.