542 F.2d 1226
 37 A.L.R.Fed. 799
 Gloria MASON and Leroy Mason, Appellees,
v.
GENERAL FINANCE CORPORATION OF VIRGINIA, a Delaware
Corporation, Appellant.
Gloria MASON and Leroy Mason, Appellants,
v.
GENERAL FINANCE CORPORATION OF VIRGINIA, a Delaware
Corporation, Appellee.
 Nos. 75-2263, 75-2264.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 9, 1976.
Decided Oct. 13, 1976.
 
 Marvin F. Cole, Richmond, Va. (James G. Council, Cole Wells, Morano, Axselle & Johnson, Richmond, Va., on brief), for appellant in No. 75-2263 and for appellee in No. 75-2264.
 Louis A. Sherman, Richmond, Va. (John M. Levy, Neighborhood Legal Aid Society, Inc., Richmond, Va., on brief), for appellees in No. 75-2263 and for appellants in No. 75-2264.
 Before CRAVEN and RUSSELL, Circuit Judges, and MARKEY, Chief Judge, United States Court of Customs and Patent Appeals.*
 CRAVEN, Circuit Judge:
 
 
 1
 This is a Truth in Lending case brought by Gloria and Leroy Mason, husband and wife, against General Finance Corporation of Virginia in connection with two consumer loan transactions entered into in July and December 1973. The major question presented is whether General Finance violated the requirements of the Act[1] and Regulation Z[2] by displaying the "Contract Rate" as defined by the Virginia Small Loan Act along with mandatory federal disclosures without satisfying the procedures set out by 12 C.F.R. § 226.6(c)(2) for the disclosure of "inconsistent state requirements."
 
 
 2
 The district court held that General Finance had violated the Truth in Lending law and awarded both plaintiffs civil penalties as to each loan transaction and cost and attorney's fees.[3] The court ruled for General Finance on its counterclaim for the unpaid balance of the December 1973 loan plus interest on the unpaid balance since May 1974 when the Masons ceased payments.[4]
 
 
 3
 We affirm,[5] except as to the award of a separate penalty to both Gloria and Leroy Mason, Powers v. Sims & Levin, --- F.2d ---- (4th Cir. 1976), and remand to the district court.
 
 I.
 
 4
 As permitted by the Truth in Lending Act, General Finance provided the Masons with a combined note and disclosure statement, which they labeled "Note and Disclosures Required by Federal and State Law." This statement begins by presenting the required federal disclosures as to the amount of "Finance Charge," "Annual Percentage Rate," and "Total of Payments," followed by a disclosure relating to credit insurance. Then came the section of disclosures upon which this case is based. It includes a description of
 
 Total of Payments
 Amount Financed
 Official Fees
 
 5
 Finance Charge Contract Rate Annual Percentage Rate
 
 Delinquency and Prepayment
 
 6
 Security.
 
 
 7
 All of these disclosures are clearly required[6] or permitted[7] by the Truth in Lending Act except "Finance Charge Contract Rate Annual Percentage." It is that disclosure, including a state law concept among other clearly permissible federal disclosures, without any designation, that is the heart of this case.[8]
 
 
 8
 Under the "Finance Charge Contract Rate Annual Percentage Rate" heading appeared the following:
 
 
 9
 The Finance Charge stated above is the approximate amount which would be earned for payment of Amount Financed (Principal) according to schedule at the contract rate of Finance Charge. The contract rate is 21/2% per month on that part of the Amount Financed (unpaid principal balance) not exceeding $300, and 11/2% per month on any remainder of said Amount Financed, computed on the basis of the number of days actually elapsed and for the purpose of such computations a month shall be any period of thirty consecutive days, subject to the limitations imposed by Subsections 6.1-271 through 6.1-285 of the Code of Virginia, 1950 as amended. The Annual Percentage Rate when computed by the actuarial method for payment according to schedule would yield the Finance Charge but it is not the contract rate.
 
 
 10
 (Emphasis added).
 
 
 11
 It is clear, and the parties are in agreement, that the "Contract Rate" as defined above is the prescribed method of computing and contracting for interest charges in Virginia. Virginia Small Loan Act, Va.Code Ann. § 6.1-272. It is equally clear that the term appears in the note because that is a requirement of the Small Loan Act, Va.Code Ann. §§ 6.1-277, 281 & 284.
 
 
 12
 The Masons argue that the above "statement" of the "Contract Rate" is an inconsistent state disclosure requirement within the meaning of 15 U.S.C. § 1610(a) and 12 C.F.R. § 226.6(b) and accordingly must be presented in the manner specified by 12 C.F.R. § 226.6(c). And they argue, since it is not so displayed, General Finance has violated the Truth in Lending Act.
 
 Inconsistent State Disclosure Requirements
 
 13
 In determining if the "Contract Rate" disclosure is inconsistent with the requirements of the Act, it is necessary to examine the general legislative and regulatory scheme. As to state disclosure and rate of charge statutes, Congress provided that the Act would have only limited effect:
 
 
 14
 (a) This subchapter does not annul, alter, or affect, or exempt any creditor from complying with, the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter or regulations thereunder, and then only to the extent of the inconsistency.
 
 
 15
 (b) This subchapter does not otherwise annul, alter or affect in any manner the meaning, scope or applicability of the laws of any State, including, but not limited to, laws relating to the types, amounts or rates of charges, or any element or elements of charges, permissible under such laws in connection with the extension or use of credit, nor does this subchapter extend the applicability of those laws to any class of persons or transactions to which they would not otherwise apply.
 
 
 16
 15 U.S.C. § 1610.
 
 
 17
 The Congress clearly did not preempt the field. Not only is the substantive law of the state preserved intact as to the rates of charges, but even disclosure of information in connection with credit transactions, required by state law, is specifically protected by the federal statute "except to the extent that those laws are inconsistent with the provisions of (the Consumer Credit Protection Act) or regulations thereunder, and then only to the extent of the inconsistency." 15 U.S.C. § 1610(a). It is our federalism, and congressional respect for it, that occasions the difficulty in this case. Our problem, then, is how to accord supremacy to federal law and at the same time honor the provisions of state law in accordance with the congressional directive.
 
 
 18
 The Congress authorized the Board of Governors of the Federal Reserve System to promulgate regulations to implement the statute. Pursuant to that authority, Regulation Z was adopted for the purpose, among others, of reconciling both state and federal interests in the subject matter.[9]
 
 
 19
 Section 226.6(c) of Regulation Z[10] addresses itself to the problem of reconciliation. Consistent with congressional directive, it does not undertake to prevent any money lender from disclosing to the borrower information required by state law even though conveyed in words different from the federally preferred terms "Finance Charge" and "Annual Percentage Rate." What it does provide is that the utilization of other words of the lending art shall be subordinated to the uniform federal form of disclosure and conspicuously identified by line separation and conspicuous heading to indicate state origin and not federal approval.
 
 
 20
 But the regulation only applies to state mandated disclosures which are "inconsistent with the requirements of the Act." The regulations, § 226.6(b), provide the following definition of "inconsistent" as relevant to the facts of this case:
 
 
 21
 (i) Requires a creditor to make disclosures or take actions different from the requirements of this part with respect to form, content, terminology, or time of delivery;
 
 
 22
 (Emphasis added).
 
 
 23
 The district court found inconsistency under the above definition both as to content and terminology. We believe that while the "Rate of Charge" as defined by Virginia statute is potentially inconsistent in content with federally defined "Finance Charge" and "Annual Percentage Rate," there is no conflict under the facts of this case. Therefore, if there is here a conflict cognizable by the regulation, it must be in the difference of terminology between these terms.
 
 
 24
 When in 1968 the Congress enacted the Truth in Lending Act, its stated purpose was "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601. And in doing so, it acted in response to the revelation that "consumers remained remarkably ignorant of the nature of their credit obligations and of the costs of deferring payment." Mourning v. Family Publications Service, Inc., 411 U.S. 356, 363, 93 S.Ct. 1652, 1657, 36 L.Ed.2d 318 (1973).
 
 
 25
 The legislative history makes crystal clear that lack of uniformity in the disclosure of the cost of credit was one of the major evils to be remedied by the Act. The House Committee on Banking and Currency described the problem facing consumers of credit and the Committee's proposed solution as follows:
 
 PRESENT DISCLOSURE PRACTICES
 
 26
 Today the consumer is faced with a number of credit disclosure practices, most of which are not directly comparable to one another. With respect to rate, some creditors employ an "add on" rate, which is based on the original balance of the obligation as opposed to the declining balance. . . .
 
 
 27
 Other segments of the credit industry, such as credit unions and small loan companies employ monthly rates. Although for some it is a simple matter to multiply the monthly rate by 12, the evidence before the committee indicates that many people are not aware of the true cost of credit when it is expressed on a monthly basis.
 
 
 28
 Other creditors add a number of additional fees or charges to the basic finance charge, such as credit investigation fees, credit life insurance, and various "service" charges. . . .
 
 
 29
 Other creditors make no disclosure of rate.
 
 
 30
 The end result of these inconsistent and noncomparable practices is confusion in the public mind about the true costs of credit. A recent survey asked 800 families to estimate the rate of finance charge they were paying on their consumer debts. The average estimate was approximately 8 percent, although the actual average rate paid was almost 24 percent or nearly three times higher.
 
 
 31
 In large part, these different practices have arisen out of historical circumstances. Although many of these early difficulties with laws have been overcome, the devices originally designed to get around the usury problem have now become imbedded in industry practice. Significantly, no one segment of the industry feels it can afford to reform itself by disclosing an annual percentage rate without incurring a competitive disadvantage. Clearly, the only solution is to require by legislation that all creditors use the same method in computing and quoting finance charges including a statement of the appropriate percentage rate.
 
 
 32
 The committee believes that by requiring all creditors to disclose credit information in a uniform manner, and by requiring all additional mandatory charges imposed by the creditor as an incident to credit be included in the computation of the applicable percentage rate, the American consumer will be given the information he needs to compare the cost of credit and to make the best informed decision on the use of credit.
 
 
 33
 1968 U.S.Code Cong. & Ad.News, pp. 1970-71 (emphasis added and footnote omitted).
 
 
 34
 We believe the legislative history conclusively demonstrates that Congress was well aware of differing methods of computing and disclosing the cost of credit which were a product of historical efforts to meet state law problems and that it specifically understood the general practice of "small loan companies (was to) employ monthly rates." Congress determined this lack of uniformity to be one of the major causes of consumer ignorance, and stated in the most unmistakable terms that "the only solution is to require by legislation that all creditors use the same method in computing and quoting finance charges including a statement of the appropriate percentage rate."[11]
 
 
 35
 Moreover, in discussing the "need for the legislation," the House Banking and Currency Committee stated, "The consumer should not have to be an actuary or a mathematician to understand the rate of interest that is being charged." 1968 U.S.Code Cong. & Ad.News, at 1965. We believe that to tell the consumer that there is a federally defined finance charge and annual percentage rate and also a state "Contract Rate" without telling him that he may safely rely upon the former is to defeat the very purpose of the Act and the Regulation.
 
 
 36
 We doubt that words alone in a loan contract would suffice to convey understanding to the typical consumer of credit that what he pays for credit is actually determined by state law, that inconsistent state disclosures are nevertheless valid, but that the federal words "Finance Charge" and "Annual Percentage Rate" may nevertheless be relied upon. That this is true is the actual premise of the statute and accounts for the creation of what may sometimes be a federal fiction, "Annual Percentage Rate," but which is nevertheless accurately communicative of the approximate true cost of credit to a consumer. It is because the Congress knew that only the money lenders understood what the words meant in a loan contract that it decided to effectively adopt a new national loan vocabulary that means the same in every contract in every state.
 
 
 37
 Under the heading "Finance Charge Contract Rate Annual Percentage Rate" the lender has attempted to reconcile federal and Virginia terminology and law. The last sentence "The Annual Percentage Rate when computed by the actuarial method for payment according to schedule would yield the Finance Charge but is not the contract rate" we know, after carefully reading the briefs and with the aid of oral argument, is true, but it is not to be supposed that anyone without our advantage would understand it. The lender has told the borrower more than he needs to know and more than he can possibly understand. In order to explain to us what that one sentence means it was necessary for General Finance Corporation to include in its brief two tables of comparison of charges and an amortization schedule. We think them not worth reprinting for the tables themselves are far from self-explanatory.
 
 
 38
 Suffice it to say that the federal "Annual Percentage Rate" would be the same as the Virginia "Contract Rate" if the borrower paid on time every monthly installment. But if, as commonly occurs, the borrower was delinquent one month and prepaid another month, there would be slight variations.[12] Also the "Annual Percentage Rate yield" per month works out to be larger than the actual Virginia "Contract Rate" for the first 13 months and less for the remaining months. We think these differences are of no consequence for the simple reason that they cannot be understood by the borrower without a course in personal finance and mathematics. Nor can they even be stated by the lender except by the use of tables and schedules.
 
 
 39
 It is precisely because such true information can be worse than meaningless that the Congress determined upon uniformity of terminology. Perfection is not required, neither of the Congress nor of the lender. The " Annual Percentage Rate" tells the borrower within pennies, or at most a dollar or so, what he needs to know in terms of what credit is costing him whereas equally billed disclosure of the Virginia "Contract Rate" tells him nothing that he can use to compare the cost of credit. We hold that the Congress may rationally adopt a national loan terminology for the purpose of enabling the comparison of the cost of credit and may require the subordination of state terminology even though it is true and accurate.
 
 
 40
 We believe that to accord state lending lingo equal billing on the lending contract does not accord with congressional purpose and violates the Act and Regulation Z. Accordingly, we hold that the terminology "Contract Rate" is utterly incompatible with the mandatory federal terminology "Finance Charges" and "Annual Percentage Rate."[13]State Disclosure Requirements
 
 
 41
 General Finance argues that "Contract Rate" is included in the note and disclosure statement not pursuant to state law disclosure requirements but as a required contract term. It further contends that as an element of the substantive state law governing the making of loan agreements, "Contract Rate" comes within the meaning of 15 U.S.C. § 1610(b) and is not affected in any manner (whether inconsistent or not), instead of falling under subsection (a) where inconsistent disclosure requirements are affected to the extent of their inconsistency.
 
 
 42
 We believe that the above argument helps General Finance little, if at all. First 15 U.S.C. § 1610(a) cannot sensibly be read to bless gratituously made inconsistent disclosures but penalize those required by state law. Instead the statute provides limited protection to certain practices and disclosures because they are required by state statute. Second, whether or not the Virginia Small Loan Act is read to be a disclosure statute per se we believe is largely irrelevant. If the statute requires that the information be displayed, even if only part of the contract language, it is disclosed ; and if it falls within the class of information (credit data) covered by the federal Truth in Lending statute, it is therefore automatically a state disclosure requirement.
 
 
 43
 But even if we accept General Finance's contention that their action is covered by 12 C.F.R. § 226.6 only if it is a required disclosure under a state disclosure statute, we believe General does not prevail. It is clear from the face of the statutes that the Virginia Small Loan Act also imposes disclosure requirements on the lender. Section 6.1-277 provides in relevant part:
 
 
 44
 Except where the charges are expressed and computed on a dollar-add-on basis, charges on loans shall (1) be computed and paid only as a percentage per month of the unpaid principal balance or portion thereof; (2) be so expressed in every obligation signed by the borrower, and (3) be computed on the basis of the number of days actually elapsed.
 
 
 45
 (Emphasis added.) Section 6.1-282 requires that lenders covered by the Act shall "(a)t the time any loan is made, deliver to the borrower . . . a statement which shall disclose in clear and distinct terms . . . the agreed charges or rate of charge." And § 6.1-284 states that "(n)o licensee shall take any note (etc.) that does not give . . . a clear description of . . . the agreed rate of charge."
 
 
 46
 We believe unquestionably that the statutory pattern of the Virginia Small Loan Act prescribes both a method of determining and disclosing interest rates. Accordingly, insofar as it requires disclosure, it comes under the terms of 15 U.S.C. § 1610(a) and 12 C.F.R. § 226.6, and is effected "to the extent that (it is) inconsistent with the provisions of (the Act) or regulations thereunder . . . ." "Rate of Charge" may be computed and contracted for as required by state law, but it must be disclosed in accordance with the mandates of federal law.
 
 
 47
 Compliance with Federal Disclosure Regulations
 
 
 48
 12 C.F.R. § 226.6(c)(2)[14] allows the lender to make inconsistent state disclosures providing that all federal disclosures are clearly labeled as being "made in compliance with Federal law" and appear separately and above any other disclosures. Also, the inconsistent state disclosures must "appear separately and below a conspicuous demarcation line" and bear the identification "by a clear and conspicuous heading indicating that the statements made thereafter are inconsistent with the disclosure requirements of the Federal Truth in Lending Act."
 
 
 49
 In its disclosure statement General Finance plainly mixed the state and federal disclosures without any separation. The "Contract Rate" explanation appeared among mandated federal disclosures, with no indication that the federal terms were "made in compliance with federal law." There was, furthermore, no demarcation line between them at all and no heading at all indicating an inconsistency, let alone one which we might term clear and conspicuous. The effect was to attempt an integration of the terms as is clearly suggested by the document's heading "Note and Disclosures Required by Federal and State Law." (Emphasis added.) Under the intent of the law to create a uniform system of credit terminology applicable across states and lending institutions, the disclosure statement presented to the Masons by General Finance in this case violates the Truth in Lending Act.
 
 II.
 
 50
 In Powers v. Sims & Levin, --- F.2d ----, No. 75-1768 (4th Cir. 1976), we held that even as to credit transactions involving the right to rescind, where the creditor is required to make disclosures to each debtor, only one penalty may be recovered by husband and wife as joint obligors on a single credit transaction. Here the transaction involved provided no right of recission and as a result the lender was required to furnish only one disclosure statement. 12 C.F.R. § 226.6(d) & § 226.9. Accordingly, we hold that a fortiori, Gloria and Leroy Mason may recover only one civil penalty for each transaction involved in this case. On remand the district court will vacate its double award and enter judgment to recover a single penalty for each transaction.
 
 
 51
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 52
 DONALD RUSSELL, Circuit Judge, dissents.
 
 
 
 *
 Sitting by Designation
 
 
 [1]
 The Consumer Credit Protection Act of 1968, 15 U.S.C. § 1601 et seq., better known as the Truth in Lending Act
 
 
 [2]
 12 C.F.R. § 226
 
 
 [3]
 The Congress provided various methods of enforcement, 15 U.S.C. § 1607 (administrative enforcement), § 1611 (criminal enforcement), § 1635 (rescission), but we are concerned with only one. In § 1640 of the Act the Congress effectively made every borrower a potential prosecutor against every money lender, and provided that "any creditor who fails in connection with any consumer credit transaction to disclose to any person any information required under (the Truth in Lending Act) to be disclosed to that person is liable . . . " to pay a civil penalty in the sum of twice the amount of the finance charge, but not less than $100 nor greater than $1,000, and the cost of the action together with a reasonable attorney's fee
 
 
 [4]
 The court awarded a total civil penalty to plaintiffs of $2,424.20. From this was subtracted defendant's counterclaim of $1,234.75 ($957.25 in unpaid principal and $277.50 in interest since May 22, 1974). The net judgment for the Masons was therefore $1,189.45. An attorney's fee of $750 was also awarded
 
 
 [5]
 In No. 75-2264, the Masons cross appealed from "those parts of the District Court's Order and Memorandum decided adversely to them," specifically the court's determination that General Finance did not fail to adequately disclose the cost of credit insurance. But in light of our decision in Doggett v. Ritter Finance Co., 528 F.2d 860 (4th Cir. 1975), they abandoned the issue on appeal
 
 
 [6]
 See 12 C.F.R. § 226.8(b)(2) (Annual Percentage Rate); § 226.8(b)(3) (Finance Charge); § 226.8(b)(4) (Delinquency); § 226.8(b)(5) (Security); § 226.8(b)(7) (Prepayment); and § 226.8(d)(1) (Amount Financed)
 
 
 [7]
 See 12 C.F.R. § 226.4(b)(1) (Official Fees)
 
 
 [8]
 The Security Agreement (attached to the Loan Agreement) began identically, setting out the required federal disclosures of the amount of "Finance Charge," "Annual Percentage Rate," and "Total of Payment." The federal terms, although capitalized, are printed in smaller letters than the "Agreed Rate of Charge" which appeared just below. (General Finance uses "Agreed Rate of Charge" interchangeably with "Contract Rate" as defined by the Virginia Small Loan Act.) The source of the federal terms is not disclosed. There is no caption indicating disclosures in accordance with federal law. And dominant on the page is the Virginia "Agreed Rate of Charge."
 The parties seem to have assumed that since this information was displayed on the Security Agreement and not the federal disclosure form (in this case the Loan Agreement), it is not a violation of the Act. We need not decide, but are concerned that it was provided to the Masons in connection with each transaction, and that it gives such prominence to what we find below to be clearly inconsistent state credit terminology, with resulting potential for confusion.
 
 
 [9]
 As the Supreme Court noted in Mourning v. Family Publications Service, Inc., 411 U.S. 356, 365-66, 93 S.Ct. 1652, 1658, 36 L.Ed.2d 318 (1973), the authority given the administrative agency, here the Federal Reserve Board, to promulgate regulations under the Act was equal to the difficulty of the task it faced
 The hearings held by Congress reflect the difficulty of the task it sought to accomplish. Whatever legislation was passed had to deal not only with the myriad forms in which credit transactions then occurred, but also with those which would be devised in the future. To accomplish its desired objective, Congress determined to lay the structure of the Act broadly and to entrust its construction to an agency with the necessary experience and resources to monitor its operation. Section 105 delegated to the Federal Reserve Board broad authority to promulgate regulations necessary to render the Act effective. The language employed evinces the awareness of Congress that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish. It indicates as well the clear desire of Congress to insure that the Board had adequate power to deal with such attempted evasion. In addition to granting to the Board the authority normally given to administrative agencies to promulgate regulations designed to "carry out the purposes" of the Act, Congress specifically provided, as noted earlier, that the regulations may define classifications and exceptions to insure compliance with the Act. See supra, at 1656-1657. The Board was thereby empowered to define such classifications as were reasonably necessary to insure that the objectives of the Act were fulfilled, no matter what adroit or unscrupulous practices were employed by those extending credit to consumers.
 (Footnotes omitted.)
 In promulgating the regulations in issue in this case, we find that the Board has faithfully discharged its duty of effectuating the intent of Congress.
 
 
 [10]
 12 C.F.R. § 226.6(c) reads in relevant part:
 Any creditor who elects to make disclosures specified in any provision of State law which, under paragraph (b) of this section, is inconsistent with the requirements of the Act and this part may
 (1) Make such inconsistent disclosures on a separate paper apart from the disclosures made pursuant to this part, or
 (2) Make such inconsistent disclosures on the same statement on which disclosures required by this part are made; provided:
 (i) All disclosures required by this part appear separately and above any other disclosures,
 (ii) Disclosures required by this part are identified by a clear and conspicuous heading indicating that they are made in compliance with Federal law, and
 (iii) All inconsistent disclosures appear separately and below a conspicuous demarcation line, and are identified by a clear and conspicuous heading indicating that the statements made thereafter are inconsistent with the disclosure requirements of the Federal Truth in Lending Act.
 
 
 [11]
 See Mourning v. Family Finance Service, Inc., supra at 364, 93 S.Ct. at 1658 (citing this same legislative history: " '(B)y requiring all creditors to disclose credit information in a uniform manner, . . . the American consumer will be given the information he needs to compare the cost of credit and to make the best informed decision on the use of credit.' ")
 
 
 [12]
 General Finance argues that information on the "Contract Rate" was correctly included in the disclosure statement because additional charges and reductions would be determined by that method if the borrower were delinquent or prepaid. Brief for Appellant at 28. The regulations do require disclosures as to the method of dealing with both eventualities. However, and this is the critical point that General Finance overlooks, we believe the regulations clearly contemplate that such information shall be given in connection with these separately required disclosures where it is relevant and not in connection with "Finance Charges" and "Annual Percentage Rate," to which it has no direct application that would affect the consumer
 
 
 [13]
 General Finance contends that since monthly percentage rate is required by federal disclosure provisions for open end credit accounts it cannot be considered inconsistent with the disclosures mandated for "closed end" transactions. However, the legislative history and the Act clearly show that "open end" transactions are an explicit exception to the "annual rate disclosure" requirement. 1968 U.S.Code Cong. & Ad.News, at 1971. Congress believed that as to these transactions "the statement of an annual percentage rate would not accurately reflect the credit charges actually imposed . . . ." Id. And even this limited exception was met with substantial criticism by a number of the Act's strongest sponsors as creating a major loophole to the "only kind of percentage rate which would be meaningful (for comparison shopping across loan institutions), and readily understandable, to all consumers as it is now to all professionals in the field of money and credit is an annual percentage rate." Supplemental Views of Representatives Wright Patman, et al., 1968 U.S.Code Cong. & Ad.News, at 1990-91
 
 
 [14]
 See note 10 supra