# FLORIDA HOSPITAL ASSOCIATION, INC. v STATE OF FLORIDA, HOSPITAL COST CONTAINMENT BOARD, etc. and
# FLORIDA LEAGUE OF HOSPITAL, INC. v STATE OF FLORIDA, HOSPITAL COST CONTAINMENT BOARD, etc.
## Case Nos. 86-0669R and 86-0670R
State of Florida, Division of Administrative Hearings
September 23, 1986

### APPEARANCES OF COUNSEL

**Steven T. Mindlin, Ralph Haben & Associates,** for petitioner Florida Hospital Association, Inc.

**John French, Messer, Vickers, Caparello, French & Madsen,** for petitioner Florida League of Hospitals, Inc.

**Gary Walker,** Hospital Cost Containment Board, for respondent Hospital Cost Containment Board.

**John Knight,** Office of Public Counsel, for intervenor Citizens of the State of Florida.

### OPINION

WILLIAM C. SHERRILL, JR., Hearing Officer.

## FINAL ORDER

These cases were heard at final hearing in Tallahassee, Florida, on August 25, 1986.

The question in these cases is whether proposed rule 27J-1.062 is an invalid exercise of delegated legislative authority pursuant to section 120.54(4), Fla. Stat. (1985). The stipulated issues in these cases are:

A. Does the Hospital Cost Containment Board have the authority to reduce a hospital's gross revenue per adjusted admission in applying the penalty specified in section 395.5094, Fla. Stat. (1985)?

B. If so, may the reduced gross revenue per adjusted admission serve as the base for comparison in evaluating the rate of increase in the subsequent year's budgeted gross revenue per adjusted admission?

No ruling will be made as to the second issue since the parties did not submit evidence or argument on the point. It appears that the issue has been abandoned.

Florida Hospital Association, Inc., presented three exhibits, Florida League of Hospitals, Inc., presented one exhibit, the parties presented one joint exhibit, the Hospital Cost Containment board (HCCB) presented two exhibits, and the prehearing stipulation was made a Hearing Officer's exhibit. All exhibits are in evidence. Testimony was presented from two witnesses, John Benz and James Bracher.

## FINDINGS OF FACT

1. Petitioner Florida Hospital Association, Inc., is a non-profit corporation organized for the benefit of its 220 member hospitals, including not-for-profit, investor-owned, and governmental hospitals. T.6.

2. Petitioner Florida League of Hospitals, Inc., is a non-profit corporation organized for the benefit of its members, which are 80 investor-owned hospitals.

3. The Respondent is the Hospital Cost Containment Board (HCCB). The Intervenor is the Public Counsel on behalf of the Citizens of the State of Florida.

4. The following findings of fact are based upon stipulated facts:

A. Throughout calendar year 1985, various drafts and revisions of the proposed rule were prepared by Respondent.

B. The proposed rule was analyzed and discussed at meetings of the Financial Analysis Technical Advisory Panel (TAP) in August, October, and November, 1985 and in January, 1986.

C. As a result of industry concern raised at those TAP meetings, Respondent made several substantial revisions to the proposed rule including:

(1) Amending subsection (3)(a) regarding the offset to the penalty from indigent care assessments, to allow credit for assessments paid by the hospital, rather than accrued in the fiscal year;

(2) Amending subsection (3)(b) to provide a "carry forward" provision in the rule that would allow hospitals to carry forward into subsequent years the amount of assessments paid minus the amount of revenues received for purposes of reducing the excess used in calculating the penalty;

(3) Amending subsection (5)(e) of the rule to provide that, in applying the penalty to gross revenues, the penalty would not apply to gross revenue reflecting charity care and certain fixed-price government payors; and

(4) Amending subsection (5)(e) to allow other adjustments to the penalty on gross revenue [that] might be justified as fair and equitable to all payors.

D. In addition to the substantive changes described above, Respondent made various technical revisions to the proposed rule in response to suggestions from representatives of the hospital industry.

E. The HHCB voted to adopt rule 27J-1.062 at its January 30, 1986, Board meeting, and instructed staff to initiate the rulemaking process.

F. Joint Exhibit 1 is the April 17, 1986 draft of the proposed rule. This draft has not yet been published in the Florida Administrative Weekly, but is the proposed rule that is challenged herein. The draft incorporates the following stipulations:

(1) Paragraph (b) of subsection (1) of proposed rule 27J-1.062 shall be deleted from the proposed rule.

(2) Subsection (5) of proposed Rule 27J-1.062 shall be amended to specify that the budget reduction imposed pursuant to the proposed rule shall apply pro rata to the 12 months immediately following final Board action.

(3) Subsection (6) of proposed rule 27J-1.062 shall be deleted.

(4) Paragraph (c) of section (3) of proposed Rule 27J-1.062 shall be changed to specify that adjustments are based on adjusted admissions in the audited actual experience for the most recently complete *fiscal year*.

(5) Paragraph (b) of subsection (3) of proposed rule 27J-1.062 shall be

191

changed to specify that the Board shall consider changes in case-mix in levying any penalty pursuant to the rule.

5. It is officially recognized that the Respondent, the HCCB, published proposed rule 27J-1.062 in Vol. 12, Issue No. 7, at pp. 606-7, of the Florida Administrative Weekly on February 14, 1986.

6. The proposed rule establishes a method of calculating the penalty provided in section 395.5094(1), Fla. Stat. (1985), which is commonly called the "main" penalty. Joint Ex. 1. Rule challenges by the Petitioners were timely filed.

7. The proposed rule, implementing the above statute, requires an annual comparison by the HCCB of the hospital's audited actual experience for that year with both the Board approved budget for that year and the audited actual experience for the prior year. Joint Ex. 1. The proposed rule first calculates what is to be termed the "excess." The excess is the lesser of the following two amounts: either the absolute dollar amount of the difference between the audited actual net revenue per adjusted admission (NRAA) for the most recently completed fiscal year and the NRAA in the Board approved budget for the same year, or the absolute dollar difference between the audited actual NRAA for the most recently completed fiscal year and the prior fiscal year and the prior year's audited actual NRAA increased by the maximum allowable rate of increase (MARI). The Executive Director of the Board testified that the penalty will not be applied unless the hospital's actual audited experience for net revenues per adjusted admission exceeds *both* of these bases. T.74-5.

8. The proposed rule then contains a procedure for reducing the excess and the excess as reduced is called the "adjusted excess."

9. The "penalty" then is calculated by multiplying the adjusted excess by the total adjusted admissions based on the actual audited data for the most recently completed fiscal year.

10. The proposed rule also establishes procedures for reducing the hospital's budget based upon the penalty. Subparagraph (5), proposed rule 27J-1.062. The reduction applies on a pro rata basis to the 12 months immediately following final Board action on the penalty.

11. For the first occurrence within a five year period, the Board is to reduce the hospital's budget for net revenues up to the amount of the adjusted excess not to exceed 5% of the prior year's actual net revenues inflated by the MARI. Any amount in excess of the 5% is then imposed as a fine. Subparagraphs (5)(a) and (c), proposed Rule 27J-1.062.

192

12. For the second occurrence within a five year period, the Board is to reduce the hospital's budget for net revenues up to the amount of the adjusted excess not to exceed 2% of the prior year's actual net revenues inflated by the MARI. Any amount in excess of the 2% is then imposed as a fine. Subparagraphs (5)(a) and (c), proposed rule 27J-1.062.

13. For the third occurrence within a five year period, the Board does not reduce the budget of the hospital in any amount, but simply applies the entire penalty as a cash fine. Subparagraph (5)(b), proposed rule 27J-1.062.

14. Finally, subparagraph (5)(e) of proposed rule 27J-1.062 provides that the gross revenue in the hospital's budget must be reduced. First, pursuant to subparagraph (5)(d) of the proposed rule, the percentage of the reduction of net revenues is calculated by dividing the amount of the penalty by the amount of actual audited net revenue for the most recently completed fiscal year. The percentage of the reduction of net revenues is then multiplied by the actual audited gross revenues for the most recently completed fiscal year. The result is multiplied again by the percentage of the hospital's gross revenue generated from sources other than charity care (which is further defined in the proposed rule) and fixed-price government payors specified in the FHURS (Florida Hospital Uniform Reporting System) Manual.

15. To convert the reduced net and gross revenues in the budget to the NRAA and GRAA format, the reduced amounts are divided by the number of adjusted admissions in the budget. Subparagraphs (5)(f) of the proposed rule.

16. Petitioner, Florida Hospital Association, Inc., presented the testimony of John Benz, who was accepted as an expert in hospital finance, accounting, and budgeting. T.17. Mr. Benz testified regarding the asserted effect of the proposed rule on a hypothetical group of eleven hospitals. See FHA Ex. 1. In this hypothetical, hospital number three was chosen as the hospital penalized, and the penalty amount was assumed to be $150 in gross revenues per adjusted admission. Hospital number three initially ranked above the 50th percentile, but just below the 80th percentile for GRAA.

17. The hypothetical example further assumed that gross revenues per adjusted admission for each hospital would increase annually for ten years at 7%. It thus assumed no Board-approved GRAA in excess of 7%, or no automatically approved increase to GRAA above 75. The current MARI is 75. T. 88. It also assumed that the adjusted admission for hospital number three would e 10,000 each of the ten years. T.

**193**

24. This is typical of a 300 bed hospital. T.29. The assumption of uniform admissions is reasonable. T. 54-5. It was also assumed in the hypothetical that the HCCB will annually use the GRAA as adjusted as the basis for future year budget calculations and determining the 50th and 80th percentiles for the group. Finally, the example assumed that a 5% overage is equal to $250 and a 2% overage is equal to $100. T. 34.

18. The hypothetical example then calculated what the GRAA for all eleven hospitals would be for the ten year period both without application of a penalty to gross revenues and with the penalty applied to gross revenues. In the first year, application of the penalty to GRAA lowers the GRAA of hospital three by $150, and lowers the total gross revenues of that hospital by $1,500,000. T. 37. The reduction in GRAA lowers the 80th percentile GRAA by $20, or about 0.5%. Carrying these changes forward using the constant inflation factor of 7%, by the tenth year the GRAA of hospital three is $278 lower than it would have been without the penalty in the first year, the loss of gross revenues in the tenth year is $2,780,000, the cumulative loss of gross revenues in the ten years is $20,790,000, and the 80th percentile GRAA is less than it would have been by $55, or about 0.5%. T. 38; FHA Ex. 1. The decrease in the 80th percentile GRAA would potentially affect all eleven hospitals in the group.

19. The hypothetical example presented by the Florida Hospital Association, Inc., also set forth a calculation of the asserted effect of the penalty after ten years imposed as a first, second, or third violation in a five year period. T. 42. The asserted effect is mathematically different because the rule allocates the penalty differently for the first, second, or third violations. As mentioned above, the example assumes that a 5% overage is $250 and a 2% overage is $100. Again assuming a 7% rate of increase for each year in GRAA, the asserted effect of the three kinds of penalties is:

| *Violation* | total 10 year reduction to *gross revenues* | *Total Cash Fine* | Asserted total *effect* |
|---|---|---|---|
| First | $20,790,000 | –0– | $20,790,000 |
| Second | 13,880,000 | 500,000 | 14,380,000 |
| Third | –0– | 1,500,000 | 1,500,000 |

As will be discussed ahead, it is not possible on this record to conclude that the above three-tiered penalty procedure will result in a harsher penalty for the first violation since (1) it is not certain that there will actually be a reduction to gross revenues for the entire 10 years, and (2) there is no expert evidence as to the time value of the cash fines.

194

20. In the hypothetical discussed above, assuming as was assumed in the hypothetical that adjusted admissions would be 10,000 each year and that the GRAA would increase at 7% each year, in ten years, hospital three would have total gross revenues of $777,140,000. It would have lost $20,790,000 in gross revenues in the hypothetical example, and the sum of these two figures is $797,930,000. Thus, the percentage of the asserted amount of lost revenues is 2.6%

21. The Respondent, the Hospital Cost Containment Board, presented the testimony of James Bracher, Executive Director of the Board, who was accepted as an expert in health care financial regulation, including certificate of need, rate review, and budget regulations. T. 72-3.

22. Mr. Bracher presented another hypothetical example to illustrate the asserted effects of the penalty applied only to net revenues and applied to both net and gross revenues. The hypothetical, contained in HCCB Ex. 2, assumes that net revenues will be 70% of gross revenues in any given year, that gross revenues will increase yearly by 8%, that 50% are fixed government payors, that the penalty is to be applied 3 months in 1987 and 9 months in 1988, and that gross revenues are initially $150,000 in 1987. T. 81-82. Finally, the example assumes that the penalty will be 5% of net revenues, and is a first violation penalty. T. 82.

23. The result of the HCCB's hypothetical is that if the 5% penalty is applied only to net revenues, the penalty is completely recovered from those revenues in the first two years (pro rated since the first year has only a 3 month impact under the hypothetical assumption), and thereafter, net revenues return to the same level as if no penalty had been levied. This occurs directly as a result of the assumption that net revenues will always be 70% of gross revenues. T. 83.

24. If the penalty is applied to gross revenues as well as net revenues, the HCCB hypothetical asserts that both gross revenues and net revenues will be permanently lowered. T. 83. This occurs because gross revenues in future years are assumed to be only a constant percentage increase from the penalty year, and net revenues are assumed to be 70% of gross revenues in any given year. By 1990. the gross revenues of the hypothetical hospital would be less by $4,462, or by about 2.4%, and net revenues would be less $3,123, which of course would be the same percentage reduction since net revenues are directly related to gross revenues. HCCB Ex. 2.

25. A projected budget is based in part upon historical budgets, and thus, if an earlier budget is incorrectly too high, it is possible that the

**195**

error may be carried into the future. T. 96. However, the current Florida regulatory scheme provides all hospitals with the opportunity to justify increases in gross revenues annually, based upon current information. T. 86-7. It is possible in a future year for a hospital to gain HCCB approval of a budget for increased gross revenues due to new or expanded services, a change in case mix, or a change in length of stay. T. 90, 91. It is also possible for increases in GRAA to be automatically approved by the HCCB if the hospital is ranked below the 50th percentile in its group, or if the hospital is ranked below the 80th percentile in its group and the increase is less than the MARI. Thus, it is possible that the effect of a penalty to gross revenues in one year may be canceled out in a future year by increases to GRAA due to approval of a new budget justified upon new facts or due to automatic approval.

26. None of the hypotheticals presented in this case are expected to actually occur precisely as set forth above, and only serve as reasonable illustrations of the potential mathematical relationships between the penalty and future gross or net revenues. As discussed above, since a hospital might be able to justify a higher GRAA in a future year, the Petitioner's and Respondent's hypotheticals might never occur, or at least it is impossible to say whether the cumulative effect may continue for ten years, five years, or forever. Similarly, the assumption of the examples used, that a uniform increase in GRAA of 7% or 8% per year, while useful as a mathematical example, is unlikely to actually occur. T. 90. The rates of increase for competitor hospitals of the North Broward Hospital District have not been uniform. T. 55. Finally, the assumption of the HCCB that NRAA will be a uniform 70% of GRAA might be roughly correct, but in fact the relationship will vary from year to year. T. 123-4.

27. However, notwithstanding the lack of precise examples, several conclusions can be drawn from the hypotheticals presented. First, although it is impossible to predict how long and how much of a cumulative penalty will be felt by a hospital if the penalty is applied to gross revenues, it is relatively certain that the effect of the penalty on gross revenues will continue for several years beyond the base year. This will occur because the budget review process of the HCCB is based primarily upon past history of GRAA. T. 120. If a hospital's GRAA is lowered in a single year, it is likely that this loss of approved GRAA will affect a number of future years. Second, it is also relatively certain that if the penalty is applied only to NRAA,, a hospital will be able to return to the same NRAA it would have had without the penalty in a relatively short time, even if one assumes that the

196

relationship between NRAA and GRAA will not uniformly be 70% each year. This should occur because GRAA has not been lowered, and thus standards as an approved basis in future years for justification of the higher NRAA. Indeed, if the GRAA is below the 50th percentile, approval will be automatic.

28. Gross revenues minus other operating revenues equals total patient charges. T. 51, 57. Gross revenues minus other operating revenues is what is billable to the patient. Id; T. 56-7.

29. Not all charges billed are collected. The percentage of uncollected patient billings differs from hospital to hospital. Indigents do not pay, and the percentage of indigent care can be 10% in some hospitals. T. 97. Medicare may not pay the entire amount billed for a Medicare eligible patient. T. 97. In Florida, hospitals may have 45-50% of their patients as Medicare patients. T. 98. Health maintenance organization patients and preferred provider patients may be billed discounted rates. T. 97.

30. Net revenues equal the amount received from patients, and reflect gross receipts from charges to patients. T. 50, 57, 58. Net revenues are a product of patient charges, but ae not a direct reflection of such charges. T. 59.

31. Gross revenues thus do not "equal" the amount paid by patients since at least one-half of all patients in Florida do not themselves pay charges. However, excluding other operating revenue, gross revenues do reflect the charges paid by charge-paying patients and the charges paid by third-party payors whose payments are charged-based or discounted, which is somewhat less than one-half of all patients in Florida.

32. There is a significant relationship between gross revenues and charges to patients such that the reduction of gross revenues in a budget is likely, over time, to contain or slow the increase of charges to Florida patients.

33. Petitioner's example of a lump sum Medicare settlement causing a penalty due to increase of net revenues, without increase in gross revenues, is not likely to occur. The HCCB has procedures whereby receipt of a lump sum Medicare settlement may be recognized and approved through budget amendment. T. 90-3.

34. Two prior final orders of the HCCB are in evidence as arguable precedent for the case at bar. These are the final orders in the *Lake Hospital of the Palm Beaches,* case, DOAH Case No. 85-1666H, FHA Ex. 2, and the *American Medical International* cases, DOAH Case

**197**

Numbers 85-2296H, 85-2297H, and 85-2265H, HCCB Ex. 1. In the *Lake Hospital* case, the Board applied the base year adjustment of section 395.509(11), Fla. Stat. (1984) to net revenues only. In the *American Medical International* cases, the Board construed its authority to review and approved "budgets" to include the power to approve or disapprove net revenue amounts as well as gross revenues.

35. The North Broward Hospital District invests excess funds at a rate of interest of 8% to 10%. T. 50.

36. The practical effect of the proposed rule is to provide a way to return a hospital to the approximate place it would have been had it not exceeded either its approved budget or its actual audited experienced inflated by the MARI. A secondary effect is to alter the percentile relationship of all hospitals to the level it would have been had the subject hospital not exceeded these limits.

37. If it is lawful for the HCCB to reduce GRAA as is intended in the proposed rule, and if the HCCB adopts the proposed rule and fails to follow it, the failure would unlawfully benefit both the subject hospital and all hospitals in the group since both the GRAA of the hospital and the percentile ranking of GRAA of all hospitals in the group, in that event, should be reduced. It would be an unlawful detriment in that event to Florida consumers as well.

## CONCLUSIONS OF LAW

1. Jurisdiction exists pursuant to section 120.54(4), Fla. Stat. (1985).

2. Proposed rule 27J-1.062 seeks to implement section 395.5094, Fla. Stat. (1985). All of the parties assert that the statute is clear and that rules of statutory construction are not needed, but the "clear" meaning asserted by each is the polar opposite of the other. This is a significant clue to the problem at hand: the statute is not clear in its meaning.

3. Section 395.5094(1) cannot be interpreted in a vacuum:

Every statute must be read as a whole with meaning ascribed to every portion and due regard given to the semantic and contextual interrelationship between its parts.

*Fleischman v. Department of Professional Regulation*, 441 So.2d 1121, 1123 (Fla. 3d DCA 1983). Section 395.5094(1) was enacted as a portion of the comprehensive amendments in 1984 to the "Health Care Cost Containment Act of 1979," sections 395.501 et seq., Fla. Stat. (1985). See Chapter 84-35, Laws of Florida (1984). Thus, section 395.5094(1) must be construed in a manner that gives consistent meaning to all terms contained within the Health Care Cost Containment Act.

198

4. Paragraph (1) of section 395.5094 provides initially:

(1) The board shall annually compare the audited actual *experience* of each hospital to the audited actual *experience* of that hospital for the previous year. If the board determines that the audited actual *experience* of a hospital exceeded its previous year's audited actual *experience* by more than the maximum allowable rate of increase or exceeded the projected budget as approved by the board, *whichever* is greater, the *amount of such excess* shall be determined by the board, and a penalty shall be levied against such hospital based thereon, as follows: (E.S.)

The first striking thing about this initial paragraph is that it does not define what is meant by "experience." Section 395.502(2), Fla. Stat. (1985) defines "audited actual experience" to mean "data contained within financial statements examined by an independent, Florida-licensed, certified public accountant in accordance with generally accepted audited standards," but what "data"? What is to be compared, gross revenues, net revenues, or something else?

5. The initial portion of paragraph (1) of section 395.5094 does, however, demand a comparison of the current year's audited actual experience to the prior year's audited actual experience inflated by "the maximum allowable rate of increase." This is significant because both section 395.502(15), Fla. Stat. (1985) and rule 4D-1.002(10), Florida Administrative Code, define the "maximum allowable rate of increase" *only* with respect to *gross* revenues: "Maximum allowable rate of increase" or "MARI" means the maximum rate at which a hospital is expected to increase its average *gross* revenues per adjusted admission for a given period. (E.S.)

Since the MARI is defined only as a standard of increase for gross revenues, at this point one would have to conclude that the comparisons in paragraph (1) should be to gross revenues rather than to net revenues as contained in the rule proposed by the Board, and the "amount of the excess" should be a gross revenue amount.

6. The foregoing interpretation would make a lot of sense. Section 395.5094(1), Fla. Stat. (1985) is commonly called the "main" penalty. It is obviously intended to be the primary enforcing sanction for the new budget approval system enacted by the Legislature in 1984. Since the main penalty is intended to play an important role in the enforcement of the hospital cost containment law, it is only logical that it be construed with an eye toward the regulatory actions and goals that have preceded it. In this respect, the MARI is a central normative feature of the regulatory scheme. In each budget approval cycle, 80%

of Florida's hospitals (those having gross revenues per adjusted admission less than the top 20th percentile of hospitals in each group) can obtain automatic approval of increases to budgeted gross revenues per adjusted admission so long as such increases are less than the MARI. Section 395.509(2)(a) and (b), Fla. Stat. (1985). It thus would be only logical for the main penalty to be constructed so as to be triggered if the actual experience of the hospital for gross revenues exceeded the prior year's actual experience for gross revenues exceeded the prior year's actual experience for gross revenues inflated by the normative inflation factor, the MARI. (Of course, it is also facially logical for the main penalty to be triggered if the actual experience for all revenues exceeds the approved budget by any amount.) Moreover, it is reasonable for the hospital to be allowed the greater of the "excesses" since both the approved budget and the MARI seem to be intended to be safe ground for regulated hospitals, a zone in which no adverse consequences are intended by the Legislature.

7. Notwithstanding the fact, however, that the cost containment statute elsewhere only uses the MARI as a normative goal for gross revenues per adjusted admission, the remaining portions of paragraph (1) read as follows:

. . . the amount of *such excess* should be determined by the board, and a *penalty* shall be levied against such hospital *based* thereon, as follows:

(a) For the *first occurrence* within a 5-year period, he board *prospectively reduce the current budget of the hospital by the amount of the excess* up to 5 percent; and, if such excess is greater than 5 percent over the maximum allowable rate of increase, any amount in excess of 5 percent shall be levied by the board as a fine against such hospital, to be deposited in the Public Medical Assistant Trust Fund, as created in s. 409.2662.

(b) For the second occurrence, within the 5-year period following the first occurrence as set forth in paragraph (a), the board shall prospectively reduce the current budget of the hospital by the amount of the excess up to 2 percent; and, if such excess is greater than 2 percent over the maximum allowable rate of increase, any amount in excess of 2 percent shall be levied by the board as a fine against such hospital, to be deposited in the Public Medical Assistance Trust Fund.

(c) For the third occurrence within the 5-year period following the first occurrence as set forth in paragraph (a), the board shall:

200

1. Levy a fine against the hospital in the total amount of the excess, to be deposited in the Public Medical Assistance Trust Fund.

2. Notify the Department of Health and Rehabilitative Services of the violation, whereupon, the department shall not accept any application for a certificate of need pursuant to s. 381.494 from or on behalf of such hospital until such time as the hospital has demonstrated, to the satisfaction of the board, that, following the date the penalty was imposed under subparagraph 1., the hospital has stayed within its projected budget for a period of at least 1 year. However, this provision does not apply with respect to a certificate-of-need application filed to satisfy a life or safety code violation.

3. Upon a determination that the hospital knowingly and willfully generated such excess, notify the Department of Health and Rehabilitative Services, whereupon the department shall initiate disciplinary proceedings to deny, modify, suspend, or revoke the license of such hospital or impose an administrative fine on such hospital not to exceed $20,000.

*The determination of the amount of any such excess shall be based upon net revenues per adjusted admission.* In making such determination, the board shall appropriately reduce the amount of the excess by the total amount of the assessment paid by such hospital pursuant to s. 395.101 minus the amount of revenues received by the hospital through the operation of s. 409.266(6). It is the responsibility of the hospital to demonstrate, to the satisfaction of the board, its entitlement to such reduction. It is the intent of the Legislature that the Hospital Cost Containment Board, in levying any penalty imposed against a hospital for exceeding its approved budget pursuant to this subsection, consider the effect of changes in the case mix of the hospital. It is the responsibility of the hospital to demonstrate, to the satisfaction of the board, any change in its case mix. (E.S.)

8. In summary, he statute is internally inconsistent. The "amount of the excess" first appears to mean a gross revenue figure because the statute only defines "MARI" in connection with gross revenues, and because the MARI is a normative figure for gross revenues in section 395.309(2)(a) and (b), which is the very heart of the regulatory scheme. Nonetheless, after wading through a substantial amount of fine print, paragraph (1) states that "]t]he *determination* of the amount of any *such excess* shall be *based* upon *net* revenues per adjusted admission." (E.S.)

9. From this it must be concluded that the "amount of the excess" must be "determined" by comparison of net revenues, and that at least

for the limited purposes of section 395.5094(1), Fla. Stat., the MARI is to be used in conjunction with net revenues.

10. But having "determined" the amount of the excess, what is to be done with it? Paragraph (1), previously quoted above, states that:

> . . . the amount of such excess should be determined by the board, and a penalty shall be levied against such hospital *based* thereon, as follows:
>
> (a) For the first occurrence with a 5-year period, the board shall prospectively *reduce the current budget* of the hospital *by the amount of the excess* up to 5 percent . . . . (E.S.)

The second occurrence penalty is levied in the same way, except it is levied up to 2 percent.

11. The statute does not say that the penalty "will be" the amount of the excess. It says that the penalty will be *"based'* upon the amount of the excess. The statute also does not say that the Board is to reduce "the net revenues per adjusted admission." It says that the Board is to reduce "the *budget* by the amount of the excess."

12. A "budget" is defined by section 395.502(4), Fla. Stat. (1985) to mean "the projections by the hospital, for a specified future time period, of expenditures and revenues, with supporting statistical indicators." The word "revenues" is a general reference to all "revenues," including "gross revenues" and "net revenues" as these terms are specifically defined by section 395.502(11) and (17), Fla. Stat. See also the final order in the *American Medical International* cases, HCCB Ex. 1.

13. Proposed rule 27J-1.062 calculates the "amount of the excess" as a net revenue figure consistent with the definition of the "amount of the excess" contained in the statute. The proposed rule then "bases" the penalty upon the "amount of the excess" by "reducing the budget" is to the entire budget as defined by section 395.502(4), including all revenues, gross and net, and the penalty is "based" upon the "amount of the excess" by using the net revenue figure as a basis for conversion to a reduction to gross revenues per adjusted admission. Proposed rule 27J-1.062, therefore, is consistent with section 395.5094(1), Fla. Stat. (1985), and is a reasonable interpretation of that statute.

14. The final order in the *Lake Hospital* case, DOAH Case Number 85-1666H, FHA Ex. 2, does not compel a contrary interpretation of section 395.5094(1) in this case. In the *Lake Hospital* case, the Board determined that the base year adjustment provided by section 395.509(11), Fla. Stat. (1985) should be applied only to net revenues,

and not to gross revenues. But the statute in that case is different from section 395.5094(1). Section 395.509(11) provides that "the projected budget of that hospital *for such revenues* for fiscal year 1986 shall be reduced by the amount of such excess . . . ." Earlier in the same sentence, "such revenues" is defined as net revenues per adjusted admission. Thus, section 395.509(11) explicitly limits the reduction to only "the budget for net revenues." In the case at bar, the reduction is to the "budget" as a whole, and the penalty is "based" on the "excess."

15. The construction of section 395.5094(1), Fla. Stat. (1985) urged by the Petitioners, that the main penalty only involves net revenues, is also consistent with the statute, and would have been a permissible interpretation had the Board elected to frame its rule in that fashion. It is not, however, as reasonable as the interpretation in the proposed rule, since its fails to give meaning to all words as used in the Health Care Cost Containment Act of 1979. It further is not as reasonable as that in the proposed rule because it would be less effective in implementing the Legislature intent explicitly expressed in section 395.5025, Fla. Stat., as will be discussed ahead. That section makes it clear that the Legislature intended the Act to provide an effective means to contain "rising hospital costs." Gross revenues do not precisely "equal" the amounts paid by patients, see finding of fact 31, but there is significant relationship between gross revenues and charges to patients such that a reduction of gross revenues will likely, over time, contain or slow the increase of charges to Florida patients. See findings of fact 21 and 28-31.

16. In summary, both interpretations urged by the parties in this case are permissible constructions of section 395.5094(1), Fla. Stat. In the normal case, this conclusion would result in a finding in favor of the agency since, as will be discussed ahead, great deference is given to an agency in its interpretation of a statute in rulemaking, particularly where the statute is one committed to the agency's fundamental, regulatory jurisdiction and expertise. Petitioners argue, however, that the statute and rule at stake here are penal, and penal statutes must be strictly construed. The argument continues that to strictly construe section 395.5094(1), a construction must be placed upon the statute which is most favorable to those entities subject to the penalty.

17. There appears to be no cases directly on point to resolve this dilemma. The question is one of importance for the agency since a strict construction would significantly alter the normal latitude afforded agencies in rulemaking. The question is equally of importance to the Petitioners since the articulation of a substantial penalty is at stake.

**203**

18. Resolution of this conflict must begin with standard rule challenge principles. As set forth in *Agrico Chemical Co. v. State, Department of Environmental Regulation*, 365 So.2d 759, 763 (Fla. 1st DCA) *cert. denied*, 376 So.2d 74 (1979), a proposed rule is measured by the following standards:

> The burden is upon one who attacked the proposed rule to show that the agency, if it adopts the rule, would exceed its authority; that the requirements of the rule are not appropriate to the ends specified in the legislative act; that the requirements contained in the rule are not reasonably related to the purpose of the enabling legislation or that the proposed rule or the requirements thereof are arbitrary or capricious.

> A capricious action is one which is taken without thought or reason or irrationally. An arbitrary decision is one not supported by facts or logic, or despotic.

19. The logic of having the main penalty apply to both net and gross revenues has already been discussed above. See paragraphs 6 and 11-13. The interpretation of section 395.5094(1) found in the proposed rule is consistent with the meaning of "budget" found elsewhere in the Health Care Cost Containment Act of 1979. The interpretation fits harmoniously with the basic power of the Hospital Cost Containment Board, conferred by sections 395.504(2) and 395.509, Fla. Stat., to approve or disapprove "budgets," including both gross and net revenues. It makes sense that if the approved "budget" has been exceeded, the penalty would be fashioned so as to correct the transgression of the original approval. See findings of fact 18, 25, 27, 32, and particularly 36. It is true that the penalty articulated by the proposed rule is greater than if only applied to net revenues, and will impact other hospitals in the group as well by altering the percentile rankings, although the impact will not necessarily be as large as projected by the Petitioners. But this impact is only the practical effect of returning the hospital to a budget level at which it should have been, absent the excess, and of restoring the percentile rankings of the group to the level they would have been had the instant hospital stayed within its approved budget. Moreover, the effect is not forever. In any future year, a hospital may obtain legitimate increases to gross and net revenues if justified by the facts. If the hospital is below the 50th percentile, the increase will be automatic. Therefore, the proposed rule in this case is clearly neither arbitrary nor capricious. It is also appropriate to the ends specified in the legislative act, and the requirements of the rule are reasonably related to the purpose of the enabling legislation.

20. The only issue, then, is whether the proposed rule "exceeds the

authority" of the Hospital Cost Containment Board as conferred by statute. The Board has general authority pursuant to section 395.505(1), Fla. Stat. (1985) to adopt rules. Thus, the question is whether the proposed rule "exceeds the authority" conferred by section 395.5094(1), Fla. Stat. (1985).

21. The normal standard to be applied to determine whether a proposed agency rule is contrary to a statute is found in *Department of Professional Regulation, Board of Medical Examiners v. Durrani*, 455 SO.2d 515, 517 (Fla. 1st DCA 1984), which held in part that:

The well recognized general rule is that agencies are to be accorded *wide discretion* in the exercise of their lawful rulemaking authority, clearly conferred or fairly implied and consistent with the agencies' general statutory duties. . . . An agency's construction of the *statute it administers* is entitled to *great weight* and is not to be overturned unless *clearly erroneous* . . . . Moreover, the agency's interpretation of a statute *need not be the sole possible interpretation or even the most desirable one*; it need only be *within the range of possible* interpretations. (E.S.)

22. The interpretation of the Hospital Cost Containment Board of section 395.5094(1), Fla. Stat. (1985) in the promulgation of rule 27J-1.062 is clearly "within the range of possible interpretations." Thus, if the foregoing were the only rule of law applicable in this case, it would be quite certain that the proposed rule is valid.

23. Petitioners argue, however, that the issue here is the interpretation of a penal statute, and that in such cases, the statute must be strictly construed.

24. The statute in this case is a penal statute. The heading and the wording used in section 395.5094 used the word "penalty." It is officially recognized that the title of committee substitute for Senate Bills Nos. 176 and 697, which became Chapter 84-35, Laws of Florida (1984), refers to the amendments which created these penalties (then section 395.514) as amendments "modifying penalty provisions."

25. The rule of strict construction, however, does not appear to be directly applicable to the case at bar. Section 395.5094 is a part of the "Health Care Cost Containment Act of 1979," as extensively amended by Chapter 84-35, Laws of Florida (1984). See Section 395.501 et seq., Fla. Stat. (1985). The Act contains a strong and specific statement of Legislative intent evidencing a desire on behalf of the Legislature that hospital costs be contained so as to benefit the public. The statement of Legislative intent provides in pertinent part:

395.5025 *Legislative intent to assure affordable health care.* It is the

intent of the Legislation to assure that adequate health care is affordable and accessible to all the citizens of this state. . . . The Legislature finds and declares that rising hospital costs and cost shifting are of *vital concern* to the people of this state because of the danger that hospital services are becoming unaffordable and thus inaccessible to residents of this state. . . . As a safety net, it is the intent of the Legislature to establish a program of prospective budget review and approval in the event that competition-oriented methods do not adequately contain costs and the access of Floridians to adequate hospital care becomes jeopardized because of unaffordable costs. (E.S.)

26. On two previous occasions, the Florida Supreme Court has declined to apply the strict construction test where a statute has been enacted for the public good. In *State v. Hamilton*, 388 So.2d 561, 562 (Fla. 1980), the Court wrote:

A statute enacted for the public benefit should be construed liberally in favor of the public even though it contains a penal provision.

The *Hamilton* case, like the case at bar, concerned regulation of a subject matter of "vital concern" to all Florida citizens, air and water pollution. The *Hamilton* case quoted its holding from *City of Miami v. Berns*, 245 So.2d 38, 40 (Fla. 1971), which similarly dealt with a matter of "vital concern" to all Florida citizens, the Florida open meetings law ("Government in the Sunshine" law).

27. If "rising hospital costs" are of *"vital concern* to the people of this state because of the danger that hospital services are becoming unaffordable and thus inaccessible to residents of this state," it would not be reasonable to construe section 395.5094(1) as limited to only the most lenient penalty for a violation of the regulatory scheme that is intended to address this "vital concern."

28. There may be a second reason for not applying the strict construction principle to the case at bar. Most of the strict construction cases, including ones cited by the Petitioners, arose when a penal statute was applied in an adjudicatory proceeding involving a person. See *e.g. Fleischman v. Department of Professional Regulation*, 441 So.2d 1120 (Fla. 3d DCA 1983) (suspended real estate license); *State v. Waters*, 436 So.2d 66 (Fla. 1983) (criminal); *State ex rel. Jordan v. Pattishall*, 126 So. 147 (Fla. 1930) (revocation of dental license); *First Federal Savings and Loan Association of Seminole County v. Department of Business Regulation, Division of Land Sales and Condominiums*, 472 So.2d 494 (Fla. 5th DCA 1985) (civil penalty, savings and loan); *Padovano v. Wotitzky*, 355 So.2d 871, 873 (Fla. 2d DCA 1978)

(penalty to corporate officer in private suit). But see *Geneva Investment, Ltd. v. Trafalgar Developers, Ltd.*, 274 So.2d 581, 583 (Fla. 3d DCA 1973) (contract suit, private parties); *Florida Industrial Commission v. Manpower, Inc. of Miami*, 91 So.2d 197, 199 (Fla. 1956) (initial licensing).

29. It would appear, therefore, that the *genesis* of the strict construction rule is due process: a person who is to be penalized must first be given a fair and clear warning of the conduct that may be penalized:

> Penal statutes are construed narrowly to insured that no individual is convicted unless a fair warning [has first been] given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.

*Mourning v. Family Publications Services, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 1663-4 (1973). Florida cases have uniformly made the same point. *State v. Llopis*, 257 So.2d 17 (Fla. 1971); *State v. Winters*, 346 So.2d 991, 993 (Fla. 1977); *Lester v. Department of Professional and Occupational Regulation*, 348 So.2d 923, 925 (Fla. 1st DCA 1977); *Gardner v. Johnson*, 429 SO.2d 1341 (Fla. 2d DCA 1983).

30. The rule challenge here does not involve the application of a penal statute in the adjudicatory setting. The challenge here is to a rule proposed by the agency charged by statute to administer the "Health Care Cost Containment Act of 1979." The construction of a penal statute in the adjudication of an individual case requires strict construction because the penalty is then being applied to a person for his past behavior, and issues of notice and fair warning arise. But interpretation of statutes in the rulemaking process seems to be different because rulemaking is quasi-legislative in character:

> Rulemaking by an agency is *quasi-legislative* action and must be considered with *deference* to that function. (E.S.)

*Agrico*, supra, 365 So.2d at 762. In rulemaking, the agency is acting in a quasi-legislative capacity to flesh out the regulatory program committed to it by the Legislature. "Deference" is given to its construction of its statutes because the regulatory program has been committed to it by the Legislature. In this context, the only purpose of the strict construction rule would appear to be to ensure that the penalty in the rule, as proposed, is clear and gives fair warning of he conduct prescribed. In the case at bar, there is no issue regarding the clarity of the rule. Having presumably satisfied the clarity requirement, the agency's penalty rule need only be one of the reasonable interpretations of the statute. *Durrani*, supra.

31. Application of the strict construction principle to rulemaking

**207**

when a penalty is the subject of the proposed rule would limit the quasi-legislative authority of the agency to only those rule-articulated penalties that are most lenient under the enabling statute. This would be the reverse of deference to the quasi-legislative responsibility of the agency and would make little sense.

32. In summary, proposed rule 27J-1.062 is a valid exercise of delegated Legislative authority.

## FINAL ORDER

Upon consideration of the foregoing, it is ORDERED that proposed rule 27J-1.062 is a valid exercise of delegated legislative authority.

DONE and ORDERED this 23rd day of September, 1986, in Tallahassee, Florida.